Christopher R. Pitoun (SBN 290235)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
christopherp@hbsslaw.com

Shelby R. Smith (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
shelby@hbsslaw.com

Rachel E. Fitzpatrick (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 W. Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
rachelf@hbsslaw.com

*Attorneys for Plaintiffs*
[*Additional Counsel Listed on Signature Page*]

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

KANDACE HUNTER-BROCK, MARINA GUSEVA, JOSHUA DAVIS, ALAN FREIDEL, and JAY FISHMAN, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

HYUNDAI MOTOR AMERICA, INC. and KIA AMERICA, INC.,

Defendants.

Case No. 8:26-cv-03416

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. PARTIES ..... 3

A. Plaintiff Kandace Hunter-Brock ..... 3

B. Plaintiff Marina Guseva ..... 4

C. Plaintiff Joshua Davis ..... 6

D. Plaintiff Alan Freidel ..... 7

E. Plaintiff Jay Fishman ..... 9

F. Defendants ..... 10

III. JURISDICTION AND VENUE ..... 11

A. Jurisdiction ..... 11

B. Venue ..... 11

IV. FACTUAL ALLEGATIONS ..... 12

A. The ICCU ..... 12

B. The ICCU Defect ..... 13

C. Defendants Knew About the ICCU Defect ..... 32

V. RULE 9(B) ALLEGATIONS ..... 41

VI. CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS ..... 42

VII. CLASS ACTION ALLEGATIONS ..... 57

VIII. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED ..... 61

A. Discovery Rule ..... 61

B. Equitable Estoppel ..... 62

IX. CAUSES OF ACTION ..... 64

A. Claims Brought on Behalf of the Nationwide Class (or in the alternative, the State or California Classes) ..... 64

COUNT I: VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) (Individually and on Behalf of the Nationwide Class, or in the Alternative, the State Classes) ....64

COUNT II: VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) (Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class) ....67

COUNT III: FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER CALIFORNIA LAW (Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class) ....69

COUNT IV: UNJUST ENRICHMENT UNDER CALIFORNIA LAW In the Alternative to All Other Claims (Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class) ....70

COUNT V: VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*) (Brought by Plaintiff Hunter-Brock Individually and On Behalf of the California Class) ....73

B. Claims Brought on Behalf of the Illinois Class ....75

COUNT VI: FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER ILLINOIS LAW ....75

COUNT VII: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW (Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class) ....77

COUNT VIII: UNJUST ENRICHMENT UNDER ILLINOIS LAW In the Alternative to All Other Claims (Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class) ....78

COUNT IX: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq*. and 720 ILCS 295/1a) (Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class) ....81

C. Claims Brought on Behalf of the Ohio Class ....83

COUNT X: FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER OHIO LAW (Brought By Plaintiff Joshua Davis Individually and on behalf of the Ohio Class) ........................83

COUNT XI: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER OHIO LAW (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class) ........................84

COUNT XII: UNJUST ENRICHMENT UNDER OHIO LAW In the Alternative to All Other Claims (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class) ........................86

COUNT XIII: VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE §§ 1345.01, *et seq.*) (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class) ........................89

COUNT XIV: VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT ........................92

D. Claims Brought on Behalf of the Florida Class ........................94

COUNT XV: VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) (Brought By Plaintiff Alan Freidel Individually and on Behalf of the Florida Class) ........................94

COUNT XVI: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW Fla. Stat. § 672.103, *et seq.* (Brought By Plaintiff Alan Freidel Individually and on Behalf of the Florida Class) ........................96

COUNT XVII: FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER FLORIDA LAW In the Alternative to All Other Claims (Brought by Plaintiff Alan Freidel Individually and on Behalf of the Florida Class) ........................97

COUNT XVIII: UNJUST ENRICHMENT UNDER FLORIDA LAW In the Alternative to All Other Claims (Brought By Plaintiff Alan Freidel Individually and on Behalf of the Florida Class) ........................99

E. Claims Brought on Behalf of the Minnesota Class ........................102

COUNT XIX: VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT Minn. Stat. §

325F.68, *et seq*. (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)........................................................102

COUNT XX: VIOLATIONS OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT ("MDTPA") Minn. Stat. § 325D.43, *et seq*. (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)...................................104

COUNT XXI: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER MINNESOTA LAW Minn. Stat. § 336.2-314 (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)...................................107

COUNT XXII: UNJUST ENRICHMENT UNDER MINNESOTA LAW In the Alternative to All Other Claims (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class) ..........................................................................108

COUNT XXIII: FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER MINNESOTA LAW (Brought By Plaintiff Jay Fishman Individually and On behalf of the Minnesota Class) ..........................................................................111

PRAYER FOR RELIEF ..........................................................................112

DEMAND FOR JURY TRIAL ..........................................................................113

Plaintiffs Kandace Hunter-Brock, Marina Guseva, Joshua Davis, Alan Freidel, and Jay Fishman ("Plaintiffs") by and through their undersigned counsel, bring this action on behalf of themselves and all others similarly situated against Defendants Hyundai Motor America, Inc. ("Hyundai") and Kia America, Inc. ("Kia") (collectively, "Defendants"). All allegations made in this complaint are based on counsel's investigation and on information and belief, except those allegations that pertain to Plaintiffs' vehicles, which are based on their personal knowledge. Counsel expects that substantial additional evidence in support of these allegations will be adduced through discovery.

## I. INTRODUCTION

1. Plaintiffs bring this action on behalf of themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased any Hyundai or Kia vehicle models identified herein equipped with defective Integrated Charging Control Units ("ICCUs") (the "Class Vehicles"). The Class Vehicles include:[1]

- 2024 Kia EV9
- 2022–2024 Kia EV6
- 2022–2024 Hyundai IONIQ 5
- 2023–2025 Hyundai IONIQ 6
- 2023–2025 Hyundai IONIQ 9
- 2023–2025 GV70 Electrified
- 2023–2024 Genesis GV80 and GV80 Electrified
- 2023–2025 Genesis GV60

2. The ICCUs installed in the Class Vehicles are responsible for taking power from the vehicles' high-voltage EV batteries, converting it to a lower voltage, and charging the vehicles' 12-volt batteries. The 12-volt battery powers numerous

[1] Plaintiffs reserve the right to revise the definition of Class Vehicles as discovery progresses.

essential vehicle functions, including vehicle startup and components of the braking system.

3. However, the ICCUs installed in the Class Vehicles are defective due to design and/or manufacturing defects, resulting in ICCU failure (the "Defect" or "ICCU Defect"). When the defective ICCU fails, it does not adequately charge the 12-volt battery, causing the battery to lose power and ultimately rendering the vehicle inoperable. As a result, Plaintiffs and Class Members are left with vehicles that are not fit for ordinary use and that may become inoperable without warning, stranding drivers and passengers. The ICCU Defect also causes Plaintiffs and Class Members to expend considerable time and out-of-pocket funds arranging for their vehicles to be towed, waiting for dealerships to diagnose and repair their vehicles, replacing depleted 12-volt batteries and failed ICCUs, and arranging alternative transportation to work, school, medical appointments, and other obligations.

4. Defendants have undertaken multiple attempts to address the ICCU Defect, including recalls, software updates, replacement of depleted 12-volt batteries, and replacement of failed ICCUs. These repair attempts, however, have failed to remedy the ICCU Defect. Among other things, Defendants issued software updates that did not prevent subsequent failures and replaced failed ICCUs with replacement ICCUs that suffered from the same defective manufacture and/or design. Consequently, Plaintiffs and Class Members continue to experience ICCU and 12-volt battery failures after presenting their vehicles for repair, requiring repeated dealership visits and causing them to lose the use of their vehicles for days, weeks, or even months.

5. Had the true nature of the defective ICCUs and the resulting effects on the Class Vehicles' safety, operability, charging capability, reliability, and fitness for their intended use been disclosed to Plaintiffs and Class Members at the time of purchase or lease, they would not have purchased or leased the Class Vehicles, or they would have paid substantially less for them than they did.

6. Plaintiffs and Class Members commence this action to obtain money damages and/or injunctive relief arising out of their overpayment for the Class Vehicles, loss of use of the Class Vehicles, and incurred repair, towing, and other out-of-pocket costs due to the ICCU Defect which affects the Class Vehicles' safety, operability, charging capacity, and fitness for their intended use.

## II. PARTIES

### A. Plaintiff Kandace Hunter-Brock

7. Plaintiff Kandace Hunter-Brock is a resident and citizen of Hemet, California. Plaintiff Hunter-Brock purchased a new 2024 Hyundai IONIQ 5 on March 1, 2024, from Gosch Hyundai in Hemet, California. The vehicle's VIN is KM8KN4DE8RU263684. The vehicle was covered by Hyundai's standard warranties. Before her purchase, Plaintiff Hunter-Brock researched the vehicle on Hyundai's website, Edmunds, and Carfax and noticed that it had very good ratings. Passenger safety and reliability were primary factors in Plaintiff Hunter-Brock's decision to purchase her vehicle. Plaintiff Hunter-Brock purchased the vehicle for personal, family, and household use and reasonably expected it would be safe, reliable, and free from material defects that would interfere with its ability to charge and operate as intended.

8. In approximately October 2025, Plaintiff Hunter-Brock experienced a battery-related problem with her Class Vehicle that rendered the vehicle inoperable and required towing and replacement of its ICCU. Plaintiff Hunter-Brock was driving with her husband when the Class Vehicle displayed a "Check Electrical System" warning and a "Power Reduced" warning and entered "limp mode."

9. Plaintiff Hunter-Brock had the vehicle towed to Gosch Hyundai, where its ICCU was replaced. Plaintiff Hunter-Brock was deprived of the use of her Class Vehicle for an extended period while the repair was performed. During this period, Plaintiff Hunter-Brock required a rental vehicle while her Class Vehicle remained in Hyundai's possession for repair.

10. As a result of the battery failure, Plaintiff Hunter-Brock lost the use of her Class Vehicle and incurred out-of-pocket expenses for a rental vehicle and for gas associated with the incident.

11. Plaintiff Hunter-Brock has suffered damages including, but not limited to, overpayment for the Class Vehicle at the time of acquisition, loss of use and enjoyment of the Class Vehicle, out-of-pocket costs, and time and inconvenience associated with seeking repairs for the ICCU Defect.

12. Had Hyundai disclosed the ICCU Defect and the associated risk of 12-volt battery depletion and vehicle inoperability, Plaintiff Hunter-Brock would not have acquired the Class Vehicle or would have paid substantially less for it.

**B. Plaintiff Marina Guseva**

13. Plaintiff Marina Guseva is a resident and citizen of Buffalo Grove, Illinois. Plaintiff Guseva and her husband Dmitry Gusev leased a new 2024 Genesis GV60 on December 28, 2023, from Genesis of Glenview in Glenview, Illinois. The vehicle's VIN is KMUKCDSC0RU020119. The vehicle was covered by Hyundai's standard warranties. Before her lease, Plaintiff Guseva researched the vehicle on the Insurance Institute for Highway Safety (IIHS) and the National Highway Traffic Safety Administration (NHTSA) websites. She saw the 2024 Genesis GV60 had earned the IIHS's Top Safety Pick+ designation and NHTSA's five-star overall safety rating. Vehicle safety was an important consideration for her, and she relied on both of these ratings in deciding to lease her vehicle. Plaintiff Guseva leased the vehicle for personal, family, and household use and reasonably expected it would be safe, reliable, and free from material defects that would interfere with its ability to charge and operate as intended.

14. On December 3, 2024, Plaintiff Guseva experienced a battery-related problem with her Class Vehicle that rendered the vehicle inoperable while she was driving alone. It was a very cold winter morning and when Plaintiff Guseva first started her Genesis, the display immediately went completely black, so she shut the

vehicle off and restarted it. After Plaintiff Guseva began driving, multiple unusual messages appeared on the screen. About fifteen minutes later, Plaintiff Guseva reached her destination and began to park. As she was parking, the vehicle continued moving despite her foot being pressed firmly on the brake. Plaintiff Guseva had to steer into a wall to stop it. Her foot remained firmly on the brake at impact. Forward Collision-Avoidance Assist did not intervene, and automatic emergency braking did not activate as she approached a fixed obstacle.

15. Based on the black display, warning messages, and reports linking ICCU failures to 12-volt battery drainage and staged loss of vehicle functions, Plaintiff Guseva suspects the 12-volt battery may have been draining and the vehicle's systems may have been failing in stages. Plaintiff Guseva believes the braking system may already have been impaired.

16. The Class Vehicle's Automatic Collision Notification (ACN) system did not contact emergency services following the head-on collision. The impact damaged the building's wall and resulted in Plaintiff Guseva's vehicle being declared a total loss, yet the airbags did not deploy, and no emergency notification was sent. Instead, her Apple Watch detected the collision and automatically contacted emergency services, resulting in a police response.

17. Plaintiff Guseva contacted Genesis the same day and a case was opened. She contacted Genesis multiple times and asked them to analyze the vehicle's computer data to determine the root cause. Genesis did not investigate the cause of the collision or respond to Plaintiff Guseva's requests, and her calls were ignored. Plaintiff Guseva filed NHTSA complaint #11772757.

18. As a result of this incident, Plaintiff Guseva lost the use of her Class Vehicle and incurred out-of-pocket expenses associated with the collision.

19. Plaintiff Guseva has suffered damages including, but not limited to, overpayment for the Class Vehicle at the time of acquisition, loss of use and

enjoyment of the Class Vehicle, out-of-pocket costs, and time and inconvenience associated with the collision arising from the ICCU Defect.

20. Had Hyundai disclosed the ICCU Defect and the associated risk of 12-volt battery depletion and vehicle inoperability, Plaintiff Guseva would not have leased the Class Vehicle or would have paid substantially less for it.

**C. Plaintiff Joshua Davis**

21. Plaintiff Joshua Davis is a resident and citizen of Gates Mills, Ohio. Plaintiff Davis purchased a new 2022 Kia EV6 Wind AWD on June 13, 2022, from VanDevere Kia in Akron, Ohio. The vehicle's VIN is KNDC3DLC2N5057022. The vehicle was covered by Hyundai's standard warranties. Before his purchase, Plaintiff Davis researched available electric vehicles through Consumer Reports and Car and Driver in June 2022. Passenger safety and reliability, performance, style, amenities, and warranty coverage were primary factors in Plaintiff Davis's decision to purchase his vehicle. Plaintiff Davis purchased the vehicle for personal, family, and household use and reasonably expected it would be safe, reliable, and free from material defects that would interfere with its ability to charge and operate as intended.

22. Plaintiff Davis experienced a battery-related problem with his Class Vehicle that rendered the vehicle inoperable and required towing and replacement of its 12-volt battery.

23. In May 2026, at approximately 7:30 p.m., Plaintiff Davis's Class Vehicle failed to start while he was out shopping. Plaintiff Davis was stranded at the store and unable to drive home.

24. Plaintiff Davis had the vehicle towed to Ganley Kia, where its 12-volt battery was replaced. He was required to pay for the replacement because the battery's three-year warranty had expired.

25. As a result of the battery failure, Plaintiff Davis lost the use of his Class Vehicle and incurred approximately $700 in out-of-pocket expenses associated with the incident.

26. Plaintiff Davis has suffered damages including, but not limited to, overpayment for the Class Vehicle at the time of acquisition, loss of use and enjoyment of the Class Vehicle, out-of-pocket costs, and time and inconvenience associated with seeking repairs for the ICCU Defect.

27. Had Kia disclosed the ICCU Defect and the associated risk of 12-volt battery depletion and vehicle inoperability, Plaintiff Davis would not have acquired the Class Vehicle or would have paid substantially less for it.

**D. Plaintiff Alan Freidel**

28. Plaintiff Alan Freidel is a citizen and resident of the state of Florida. In or around February 2023, Plaintiff Freidel purchased a new 2023 EV6 GT from Kia of Wesley Chapel located in Wesley Chapel, Florida. The vehicle's VIN is KNDC44LA8P5099967. The vehicle was covered by Hyundai's standard warranties. Before his purchase, Plaintiff Freidel researched the vehicle on Consumer Reports and noticed that it had very good ratings. Passenger safety and reliability were primary factors in Plaintiff Freidel's decision to purchase his vehicle.

29. Plaintiff Freidel purchased his vehicle primarily for personal use and reasonably expected it would be safe, reliable, and free from material defects that would interfere with its ability to charge and operate as intended. Plaintiff Freidel is a retiree and requires his vehicle to be safe and reliable. He uses his vehicle to travel to medical appointments and to carry out his day-to-day life.

30. Before retiring, Plaintiff Freidel worked as an electrical engineer. Plaintiff Freidel has also owned several electric vehicles prior to his Class Vehicle.

31. Plaintiff Freidel cares for and maintains his vehicle by getting it serviced on a regular basis. Plaintiff Freidel strictly follows the maintenance schedule and visits his dealership for any official servicing.

32. Since the time that Plaintiff Freidel purchased his vehicle, he has received three recall notices from Defendant Kia. Plaintiff Freidel responded to each recall and visited his dealership to remediate his vehicle.

33. Despite having his vehicle serviced according to the recalls, Plaintiff Freidel's vehicle suddenly failed after the third ICCU recall.

34. One night, after Plaintiff Freidel had visited a community center in his neighborhood, he returned to his vehicle to find that it would no longer start. As a result, he would have been stranded had he not had a friend drive him home.

35. Plaintiff Freidel then reported the issue to Kia, and they towed his vehicle to the dealership for servicing. At that point, Kia service technicians told him that his ICCU would need replacing. However, the part was on backorder, and it would take several months for the part to arrive. It would take approximately two months for Plaintiff Freidel's vehicle to be repaired.

36. In the meantime, Kia offered him a base model Kia Soul, to use as a loaner vehicle. This loaner vehicle was not equivalent to the EV6 that he had purchased, and Plaintiff Freidel was required to expend money to fuel his vehicle with gasoline. Plaintiff Freidel paid more to fuel his vehicle with gasoline than he would have paid to power his EV6 with electricity.

37. After Plaintiff Freidel's ICCU was replaced, Plaintiff Freidel requested that his 12-volt battery be replaced as his vehicle had been sitting on the lot for two months. However, Plaintiff's dealership refused to replace his vehicle.

38. As a result, Plaintiff Freidel was forced to purchase and replace his 12-volt battery out of pocket for approximately $280.

39. Plaintiff Freidel continues to worry about his battery and that his vehicle will fail again. He regularly checks his 12-volt battery as a result.

40. Plaintiff Freidel has suffered damages including, but not limited to, overpayment for the Class Vehicle at the time of acquisition, loss of use and enjoyment of the Class Vehicle, out-of-pocket costs, and time and inconvenience associated with seeking repairs for the ICCU Defect.

41. Had Kia disclosed the ICCU Defect and the associated risk of 12-volt battery depletion, ICCU failure, and vehicle inoperability, Plaintiff Freidel would not have acquired the Class Vehicle or would have paid substantially less for it.

**E. Plaintiff Jay Fishman**

42. Plaintiff Jay Fishman is a citizen and resident of the state of Minnesota. On July 31, 2023, Plaintiff Fishman purchased a new 2023 Hyundai IONIQ 5 from Morrie's 394 Hyundai located in St. Louis Park, Minnesota. The vehicle's VIN is KM8KNDAF5PU203825. The vehicle was covered by Hyundai's standard warranties. Before purchasing his vehicle, Plaintiff Fishman researched the vehicle online and test drove it. He recalls seeing television advertisements and/or internet videos stating that the IONIQ 5 was voted the best car of the year. Passenger safety and reliability were primary factors in Plaintiff Fishman's decision to purchase his vehicle.

43. Plaintiff Fishman purchased his vehicle for personal use and reasonably expected it would be safe, reliable, and free from material defects that would interfere with its ability to charge and operate as intended. Plaintiff Fishman is a retiree and requires his vehicle to be safe and reliable.

44. Plaintiff Fishman purchased his vehicle because he cares about the environment and did not want to drive a gasoline-powered vehicle.

45. Plaintiff Fishman cares for his vehicle and follows the maintenance schedule. Plaintiff Fishman has obtained every recall remedy that Defendant Hyundai has offered, including the ones related to the ICCU.

46. However, despite the foregoing, Plaintiff Fishman began experiencing issues with his vehicle almost immediately after he purchased it.

47. Plaintiff Fishman's vehicle has failed several times during the operation of his vehicle, including completely failing once while he was driving on a highway.

48. Each time, he took his vehicle into a Hyundai dealership to identify what was wrong with his vehicle. However, Defendant's employees and technicians were unable to replicate the issues.

49. After several repeated visits, Defendant Hyundai replaced his 12-volt battery. However, despite that replaced battery, his vehicle once again failed.

50. Because of these vehicle failures, Plaintiff Fishman rarely operates his vehicle and it currently has less than 17,000 miles driven on it after leasing and owning it for over three years—an average of approximately 5,666 miles per year—which is well below the national average.

51. Plaintiff Fishman requested Defendant Hyundai to fix or buy back his vehicle, but Defendant Hyundai refused.

52. Plaintiff Fishman has suffered damages including, but not limited to, overpayment for the Class Vehicle at the time of acquisition, loss of use and enjoyment of the Class Vehicle, and time and inconvenience associated with seeking repeated repairs for the ICCU Defect.

53. Had Hyundai disclosed the ICCU Defect and the associated risk of 12-volt battery depletion and vehicle inoperability, Plaintiff Fishman would not have acquired the Class Vehicle or would have paid substantially less for it.

**F. Defendants**

54. Defendant Kia America, Inc. is a California corporation with its principal place of business located at 111 Peters Canyon Road, Irvine, California 92606. Kia markets, distributes, sells, leases, warrants, and services Kia vehicles throughout the United States through its network of authorized Kia dealerships, including the Kia-branded vehicles at issue in this action.

55. Defendant Hyundai Motor America, Inc. is a California corporation with its principal place of business located at 10550 Talbert Avenue, Fountain

Valley, California 92708. Hyundai markets, distributes, sells, leases, warrants, and services Hyundai vehicles throughout the United States through its network of authorized Hyundai dealerships, including the Hyundai-branded vehicles at issue in this action.

56. Both Hyundai and Kia are owned, at least in significant part, by Hyundai Motor Group, a South Korean entity headquartered in Seoul, South Korea. Hyundai and Kia commonly share vehicle platforms and powertrains, and many of their vehicles are built on a foundation of shared engineering and technology.[2]

## III. JURISDICTION AND VENUE

### A. Jurisdiction

57. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

58. This Court has general personal jurisdiction because Defendants are incorporated in California and conduct a substantial amount of business, including the events alleged herein, in this District. Defendants also maintain their principal place of business in California and are therefore at home in California.

### B. Venue

59. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact substantial business in this District and are headquartered in this District. Defendants have advertised in this District and have

[2] *Are Kia and Hyundai the Same Company?*, NORTHWESTHYUNDAI.COM, https://www.northwesthyundai.com/are-kia-and-hyundai-the-same-company/ (last visited Nov. 17, 2026).

received substantial revenue and profits from sales and/or leases of the Class Vehicles in this District; and have a manufacturing plant here, therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

## IV. FACTUAL ALLEGATIONS

### A. The ICCU

60. The Class Vehicles contain an ICCU which performs several charging and power-conversion functions, including supplying power necessary to maintain the vehicle's 12-volt auxiliary battery and other low-voltage vehicle electrical systems.

61. Hyundai KEFICO, the automotive supplier that manufactures the ICCU,[3] has described its ICCUs as follows:[4]

> Integrated charging control unit (ICCU) combines on-board charger (OBC) and low-voltage DC-DC converter (LDC) into one system. It performs all high-to-low voltage conversion functions necessary for charging high-voltage batteries, bidirectional V2X power conversion, and supplying power to in-vehicle electronic devices. This reduces system complexity and minimizes the number and size of components, maximizing space utilization in the vehicle and minimizing energy conversion losses to improve system efficiency. Hyundai KEFICO continues to develop customized products that integrate various control functions based on integrated and standalone charging control technologies.

Features:

| | | |
|---|---|---|
| Integration of OBC & LDC | Smaller & Lighter | Up to 92% |
| Higher efficiency less system complexity | Enhanced cost Competitiveness and space utilization | Power conversion Efficiency |

---

[3] Keith Barry, *Hyundai's and Kia's Charging Unit Issues Cause Problems for EV Owners*, CONSUMER REPORTS (Feb. 12, 2026), https://www.consumerreports.org/cars/car-recalls-defects/hyundai-ioniq-kia-iccu-failure-tesla-a3038878758/ (last visited Nov. 17, 2026).

[4] *Integrated Charging Control Unit*, HYUNDAI KEFICO, https://www.hyundai-kefico.com/en/business/ev/product.do?detailsKey=226 (last visited Nov. 17, 2026).

62. Hyundai has also described its ICCUs as follows:

> The E-GMP's newly developed Integrated Charging Control Unit (ICCU) represents an upgrade from existing On-Board Chargers (OBC)[.][5]

**B. The ICCU Defect**

63. Defendants sold and marketed the Class Vehicles equipped with defective ICCUs without disclosing that the ICCUs were prone to failure and could result in: safety hazards, failure of the ICCU and/or associated fuse, an inability to charge the 12-volt battery, substantial repair and replacement costs, repeated ICCU failures despite attempted repairs or replacements, and a loss or reduction of motive power while the vehicle is being driven.

64. When the ICCU or its associated fuse fails, the ICCU may no longer supply sufficient charge to the vehicle's 12-volt battery. Once the 12-volt battery's power decreases, the vehicle may enter a reduced power condition and can ultimately lose motive power, creating a safety risk to occupants and other motorists.[6]

---

[5] *Hyundai Motor Group to Lead Charge into Electric Era with Dedicated EV Platform 'E-GMP'*, HYUNDAI (Dec. 2, 2020), https://www.hyundai.com/worldwide/en/newsroom/detail/0000000812 (last visited Nov. 17, 2026).

[6] *Safety Recall 272: Integrated Charging Control Unit (ICCU)–Dealer Notification (REMEDY)*, NHTSA (Nov. 21, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCMN-24V868-9385.pdf (last visited Nov. 17, 2026).

65. Defendants have issued multiple recalls, covering the approximately 208,000 Class Vehicles[7] for the ICCU Defect,[8] but all have been ineffective at remedying the Defect.

66. Hyundai possessed information concerning ICCU failures by at least October 2022. At that time, Hyundai was analyzing returned ICCU components and investigating damage associated with the units. Hyundai's investigation showed that an ICCU failure could interrupt charging of the 12-volt battery and, as the battery discharged, impair the vehicle's ability to maintain motive power.[9]

67. Vehicles equipped with the defective ICCUs have been subject to multiple recalls, including recalls announced in or around March 2024 and November 2024, concerning ICCU-related failures and the resulting risk of loss of motive power.[10]

68. On March 14, 2024, Kia and Hyundai each announced safety recalls concerning ICCU failures. Kia announced NHTSA Recall No. 24V200000, covering all model year 2022-2023 Kia EV6 vehicles and certain model year 2024 Kia EV6 vehicles manufactured from November 17, 2021, through February 7,

---

[7] The 2024 Kia EV9 and Genesis GV80 are Class Vehicles but were not included in these recalls. Consumer Reports has nevertheless reported similar charging, power loss, and electrical issues in the Kia EV9.

[8] *Hyundai & Kia ICCU Recall Explained: Why 208,000 EVs Were Recalled Twice*, VOLT TEST (Jan. 1, 2026), https://getvoltest.com/blogs/news/hyundai-kia-iccu-recall-explained-why-208-000-evs-were-recalled-twice?srsltid=AfmBOoocofPoBDo_caLyT6vaPgXOYCkOK-EIvC37E8q93qFPEWsu0bxn (last visited Nov. 17, 2026).

[9] Eric Walz, *Hyundai recalls 145K vehicles over loss of power*, WARDSAUTO (Nov. 26, 2024), https://www.wardsauto.com/news/archive-auto-hyundai-recalls-ioniq5-genesis-models-145k-iccu-intergrated-charging-control-unit-nhtsa/733963/ (last visited Nov. 17, 2026).

[10] *See supra* note 8.

2024, potentially affecting 48,232 vehicles.[11] Hyundai announced NHTSA Recall No. 24V204000, potentially affecting 99,055 model year 2022-2024 Hyundai IONIQ 5 vehicles, model year 2023-2024 Hyundai IONIQ 6 vehicles, and certain model year 2023-2024 Genesis GV60 and Genesis GV70 Electrified vehicles.[12]

69. Both recalls identified substantially the same safety condition: the ICCU could become damaged and stop charging the vehicle's 12-volt battery, causing the battery to discharge while the vehicle was being driven and potentially resulting in progressive reductions in motive power and an eventual complete loss of drive power. Kia further identified transient high voltage and thermal cycling as conditions that could damage the ICCU and warned that affected drivers could experience audible warning chimes, multiple warning lights, and reduced drive power before a complete loss of motive power.[13]

70. The remedies announced by Kia and Hyundai were also substantially similar. Dealers were instructed to inspect the ICCU and associated fuse, replace those components where necessary, and install updated ICCU software.[14] Hyundai further stated that its updated software was intended to prevent overcurrent, reduce voltage peaks at the end of high-voltage battery charging, and reduce thermal

---

[11] NHTSA (Mar. 14, 2024), https://www.nhtsa.gov/?nhtsaId=24V200000 (last visited Nov. 17, 2026).

[12] NHTSA (Mar. 15, 2024), https://www.nhtsa.gov/?nhtsaId=24V204000 (last visited Nov. 17, 2026).

[13] *2022-2024 MY EV6 Vehicles – Integrated Charging Control Unit Safety Recall Campaign (SC302)*, NHTSA (Apr. 25, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCMN-24V200-7186.pdf (last visited Nov. 17, 2026); NHTSA (Mar. 14, 2024), https://www.nhtsa.gov/?nhtsaId=24V200000 (last visited Nov. 17, 2026); NHTSA (Mar. 15, 2024), https://www.nhtsa.gov/?nhtsaId=24V204000 (last visited Nov. 17, 2026).

[14] *Id.*

loading during charging and driving.[15] Kia designated its recall as Campaign SC302, while Hyundai designated its recall as Campaign 257/021G.[16]

71. The March 2024 recalls followed extensive investigations by both Defendants into ICCU-related failures. Kia had been providing information to NHTSA concerning ICCU failures and associated limp-home-mode conditions as early as May 2023 and launched voluntary service campaign SC271 that same month to address an overcurrent condition capable of causing warnings and gradual reductions in motive power. NHTSA opened Preliminary Evaluation PE23-012 on July 3, 2023, to investigate reports of reduced or complete loss of motive power involving Kia EV6 vehicles.[17]

72. Hyundai's investigation began even earlier. Beginning in October 2022, Hyundai examined ICCU warranty returns and observed heat damage to low-voltage-converter field-effect transistors within ICCU assemblies. In January 2023, Hyundai began evaluating potential ICCU overcurrent conditions, and by April 2023, NHTSA had notified Hyundai of complaints alleging loss of motive power in Hyundai IONIQ 5 vehicles. NHTSA subsequently opened Preliminary Evaluation PE23-011 on June 23, 2023, to investigate ICCU failures in certain model year 2022-2023 Hyundai IONIQ 5 vehicles. Hyundai later launched service campaign

---

[15] Part 573 Safety Recall Report 24V-204 (Mar. 15, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V204-1453.PDF (last visited Nov. 17, 2026).

[16] *See supra* note 13.

[17] 2022-2024MY EV6 ICCU Assembly Basis of Safety Defect Determination 573.6(c)(6), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V200-5381.pdf (last visited Nov. 17, 2026).

SC997 for affected Hyundai vehicles and Genesis service campaign SC907G for affected Genesis vehicles.[18]

73. Testing and field data available before the March 2024 recalls further demonstrated the seriousness and persistence of the ICCU condition. Hyundai's May 2023 testing confirmed that a low-voltage-converter fault could lead to multiple warnings, progressive reductions in motive power, and eventually a complete loss of motive power. A September 2023 joint demonstration involving Hyundai and NHTSA personnel similarly resulted in a complete vehicle stall after approximately 21 to 26 minutes of operation under harsh or worst-case conditions. By March 2024, Hyundai had confirmed 618 unique U.S. incidents reported between March 8, 2022, and March 5, 2024.[19]

74. Kia likewise continued to receive reports of ICCU-related loss of motive power despite its earlier service campaign. Between February 5 and February 14, 2024, Kia identified elevated claims following the SC271 software update in other markets, and Kia North America identified 25 unique reports of loss of motive power in vehicles that had already received the software update. By March 7, 2024, that number had increased to 34 unique reports. Kia's investigation of returned ICCUs also revealed signs of damage following thermal cycling and exposure to transient voltage peaks.[20]

75. The remedies provided through the March 2024 recalls did not repair the ICCU-related condition. Following implementation of the recalls, both Kia and Hyundai continued receiving reports of ICCU failures and loss of motive power in vehicles that had already received the recall remedies.

---

[18] Hyundai Recall Campaign 257/021G, https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V204-0136.pdf (last visited Nov. 17, 2026).

[19] *Id.*

[20] *See supra* note 18.

76. For Kia, the first such reported recurrence identified in the recall chronology occurred on May 24, 2024, when Kia received a Techline case involving a model year 2022 EV6 alleging loss of motive power after completion of the Recall No. 24V200000 remedy.[21] By November 12, 2024, Kia North America had identified 88 unique cases alleging loss of motive power following completion of that remedy.[22]

77. Hyundai similarly continued receiving reports of ICCU failures in previously remedied vehicles from June through July 2024 and recovered eight failed ICCUs for additional analysis.[23] In September 2024, Hyundai inspected a vehicle exhibiting ICCU-failure symptoms and confirmed an open-circuit condition in the ICCU fuse that resulted in limited drivability.[24] In October 2024, examination of returned components revealed damage to an internal MOSFET within the ICCU. Hyundai ultimately confirmed 57 unique U.S. incidents reported between March 25, 2024, and November 5, 2024.[25]

78. On November 18, 2024, Kia and Hyundai each announced new recalls that expanded and replaced their respective March 2024 recalls. Kia announced NHTSA Recall No. 24V867000 for certain model year 2022-2024 Kia EV6 vehicles, including vehicles previously covered by Recall No. 24V200000 and

[21] 2022-2024MY EV6 ICCU Assembly Basis of Safety Defect Determination 573.6(c)(6), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V867-4581.pdf (last visited Nov. 17, 2026).

[22] *Id.*

[23] Hyundai Recall Campaign 272/025G, https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V868-4397.pdf (last visited Nov. 17, 2026).

[24] *Id.*

[25] *Id.*

additional model year 2024 vehicles.[26] Hyundai announced NHTSA Recall No. 24V868000, potentially affecting 145,235 model year 2022-2024 Hyundai IONIQ 5 vehicles, model year 2023-2025 Hyundai IONIQ 6 vehicles, and model year 2023-2025 Genesis GV60 and Genesis GV70 Electrified vehicles.[27]

79. Both November 2024 recalls again identified ICCU damage and the resulting inability to charge the 12-volt battery as conditions capable of causing a loss of drive power. Both recalls again required dealers to inspect and replace the ICCU and associated fuse as necessary and install updated ICCU software. Critically, both recalls replaced, and rendered ineffective, the earlier March 2024 recalls and required vehicles that had already received the prior recall remedies to receive the new remedies.

80. Consumer Reports recently published an article about the ICCU Defect in which it wrote:

> Readers have asked us why the Hyundai Ioniq 5 and other electric vehicles from Hyundai, Genesis, and Kia don't score higher in Consumer Reports' evaluations despite their many merits. As with many vehicles, the answer comes down to reliability issues, and in the case of Hyundai, Genesis, and Kia EVs, those issues can often be traced back to a specific complaint: the integrated charging control unit, or ICCU.
>
> In Consumer Reports' surveys of more than 380,000 vehicles, Hyundai and Kia EV owners repeatedly complained about charging failures, power loss while driving, and other electrical issues that could make the car undrivable. These all contributed to below-average predicted reliability scores for the Hyundai Ioniq 5, Genesis GV60, Kia EV6, and Kia EV9. (The Hyundai Ioniq 9 and Ioniq 6 also share the same part.)
>
> According to Consumer Reports' reliability survey data, between 2 and 10 percent of Hyundai and Kia EV owners experienced ICCU- related issues, depending on the model

---

[26] Part 573 Safety Recall Report 24V-867 (Nov. 18, 2024), https://www.nhtsa.gov/?nhtsaId=24V867000 (last visited Nov. 17, 2026).

[27] Part 573 Safety Recall Report 24V-868 (Nov. 18, 2024), https://www.nhtsa.gov/?nhtsaId=24V868000 (last visited Nov. 17, 2026).

> and model year. By comparison, the average charging problem rate for all other 2023-2025 EVs in our survey is 1 percent or less.
>
> "It's not unusual for our reliability surveys to uncover so many issues related to a single part, but the fact that we continue to see this year after year is interesting," says Steven Elek, program leader of auto data analytics at Consumer Reports. "The Hyundai Ioniq 5 actually performed better than the Tesla Model Y in our own testing, but ICCU failures hurt the Ioniq 5's reliability so much that it has a lower Overall Score than the Model Y, and didn't meet the criteria for a spot among our Top Picks."[28]

81. This Report is consistent with publicly available consumer complaints made to NHTSA. To date, there are hundreds of complaints related to the ICCU Defect.

82. These complaints and other publicly available data show that the ICCU Defect can result in a failure to charge, electrical system warning light activation while driving, speed restrictions, complete operational failures, sudden power outages, battery damage and total power failure.[29]

83. Some Hyundai owners have also claimed that the socket and surrounding wall have been damaged when they plug their car into their home charger.[30]

84. Warnings such as: "stop vehicle check power supply"; "check electric vehicle system"; "12-volt battery voltage low stop safely"; "turn power off immediately"; and "Check power supply" have been recorded by several Hyundai owners.

---

[28] *See supra* note 3.

[29] *See supra* note 9.

[30] Nico DeMattia, *Hyundai hit with class action lawsuit over faulty EV plugs*, THE DRIVE (July 30, 2023), https://www.thedrive.com/news/hyundai-hit-with-class-action-lawsuit-over-faulty-ev-plugs (last visited Nov. 17, 2026).

85. Despite Defendants' knowledge of the ICCU Defect, years of complaints from consumers, and multiple recalls, Defendants have not remedied the ICCU Defect and vehicle owners continue to report ICCU failures:

> **August 13, 2026,** NHTSA CAMPAIGN NUMBER: 11756667
> **COMPONENT: ELECTRICAL SYSTEM**
> **NHTSA ID Number:** 11756667
> **Incident Date:** August 11, 2026
> **Consumer Location**: COLUMBUS, OH
> **Vehicle Identification Number:** KNDC3DLC8N******
> **Summary of Complaint**
> **Crash: No Fire: No Injuries: 0 Deaths: 0**
>
> I began to drive. The dashboard display read "Check low voltage supply" or something like that and on the opposite side of the display there was a small image that looks like a 12V battery. A moment later the dashboard display changed to read "DO NOT DRIVE." The car was towed to a dealer who reported a "failed ICCU and High Voltage Fuse." The vehicle was towed to a dealership where it is being repaired under warranty. The same parts were replaced on December 26, 2024, that time because the electric vehicle would no longer accept a charge from a 240VAC source, although it continued accept a charge from a high voltage DC source. At that time there was also a software update that was said to correct the defect.[31]
>
> **July 28, 2026,** NHTSA CAMPAIGN NUMBER: 11753355
> **COMPONENT: ELECTRICAL SYSTEM, ENGINE**
> **NHTSA ID Number:** 11753355
> **Incident Date:** March 23, 2026
> **Consumer Location:** BENTONVILLE, AR
> **Vehicle Identification Number:** KNDC44LA2N5******
> **Summary of Complaint**
> **Crash: No Fire: No Injuries: 0 Deaths: 0**
>
> Vehicle Safety Complaint My Kia experienced an ICCU (Integrated Charging Control Unit) failure and was at the dealership for approximately two months while awaiting repairs. The ICCU and related components were replaced, and I was told the vehicle had been repaired. However, immediately after I received the vehicle back, the "Check Electric Vehicle System" warning illuminated again. Since that time, the vehicle has continued to experience serious electrical issues. The vehicle has unexpectedly shut off while stopped at red lights and has failed to restart on multiple occasions, leaving me stranded. This creates a significant safety hazard because the vehicle can lose the ability to move while in traffic, placing me and other motorists at risk. I have returned the vehicle to the dealership twice since the ICCU replacement, but the problem has not been resolved. The dealership has been unable to identify or permanently repair the defect. I have been

[31] *NHTSA Complaint ID:* 11756667, NHTSA (Aug. 13, 2026), https://www.nhtsa.gov/?nhtsaId=11756667 (last visited Nov. 17, 2026).

without my vehicle for nearly three months this calendar year due to this issue. More importantly, I no longer feel safe driving the vehicle because I cannot trust that it will remain operational in traffic. I am submitting this complaint because I believe this represents a serious safety defect involving the vehicle's electrical system and propulsion system. I request that NHTSA investigate this issue to determine whether other Kia owners are experiencing similar failures and whether additional action is warranted to protect consumers.[32]

**April 23, 2026,** NHTSA CAMPAIGN NUMBER: 11733353
**COMPONENT**: ELECTRICAL SYSTEM
**NHTSA ID Number:** 11733353
**Incident Date:** April 7, 2026
**Consumer Location:** CYPRESS, TX
**Vehicle Identification Number:** KNDC3DLC6N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The Integrated Charging Control Unit (ICCU) failed twice within four weeks. The first failure occurred in March 2026 and was repaired under recall SC327 with a replacement ICCU and fuse. The second failure occurred April 7, 2026, approximately 12 days after pickup. Symptoms: Vehicle failed to charge overnight on Level 1 and Level 2 circuits despite being plugged in. Later that day, while driving, a "Check Electrical System" warning appeared on the dashboard followed by sudden loss of power and acceleration. Vehicle fluctuated between 25-45 mph and could not maintain speed. Vehicle was driven approximately 2.2 miles to the dealership under its own power after warning onset. Safety risk: Sudden loss of power and acceleration while driving created a hazardous condition for myself. Dealer confirmation: The authorized Kia dealer confirmed a DTC for battery overheating and acknowledged the ICCU coolant was not fully topped off after the first replacement, suggesting the recall remedy was incompletely performed. The vehicle has remained at the dealer unrepaired since April 10, 2026. Component available for inspection: Yes, vehicle is currently at the dealership. Recall remedy concern: The SC327 recall remedy did not resolve the ICCU failure. A second failure occurred within two weeks of the repair. The dealer's subsequent diagnosis of owner-caused undercarriage battery damage is contradicted by their own signed inspection report documenting all undercarriage items as passed with no damage noted.[33]

**April 2, 2026,** NHTSA CAMPAIGN NUMBER: 11728824
COMPONENT: ELECTRICAL SYSTEM
**NHTSA ID Number:** 11728824
**Incident Date:** January 20, 2026
**Consumer Location:** SPEARFISH, SD

---

[32] *NHTSA Complaint ID:* 11753355, NHTSA (July 28, 2026), https://www.nhtsa.gov/?nhtsaId=11753355 (last visited Nov. 17, 2026).

[33] *NHTSA Complaint ID:* 11733353, NHTSA (Apr. 23, 2026), https://www.nhtsa.gov/?nhtsaId=11733353 (last visited Nov. 17, 2026).

**Vehicle Identification Number:** KNDC3DLC5N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

Electrical propulsion failure resulting in 3 tow-ins. Vehicle goes into limp mode, slows to 20 mph on highway and then stops after about 2 miles. The issue appears related to the ICCU, fuse and 12V battery failures. History includes 6 attached ICCU related Repairs. #1 ICCU updated under recall SC271 at 31,678 miles. #2 Then the ICCU was replaced under recall SC302 at 45,059 miles. #3 Then the ICCU was replaced along with fuse and 12V battery after on road failure and tow in at 52,296 miles. #4 Then the ICCU was updated under recall SC327. #5 Then the ICCU, fuse and 12V battery was replaced at 69,849 miles under recall SC327 after another on road failure and tow in. #6 Then there was a ICCU overheat and charging fault related to a bad ICCU coolant reservoir cap after a charging failure and tow in at 70,957 miles.[34]

**July 22, 2026,** NHTSA CAMPAIGN NUMBER: 11752268
**COMPONENT: ELECTRICAL SYSTEM**
**NHTSA ID Number:** 11752268
**Incident Date:** June 3, 2026
**Consumer Location:** EDISON, NJ
**Vehicle Identification Number:** KM8KMDAF5NU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

On June 3, 2026, my 2022 Hyundai Ioniq 5 SE Dual Motor AWD (approximately 31,000 miles) experienced a sudden and severe high-voltage battery failure. Prior to complete failure, I noticed “Check Electrical” warning sign occurring simultaneously: a sudden and dramatic drop in driving range, dashboard warning lights illuminating, and the vehicle failing to charge properly at both home and public charging stations. The vehicle was still drivable at the time I brought it to an authorized Hyundai dealership, but displayed serious warnings indicating the HV battery system was critically compromised. Upon inspection, the dealership confirmed the main high-voltage battery had failed and required full replacement. The dealership has advised that the repair will take several months due to parts availability. This failure is not an isolated incident. Hyundai issued a recall covering 2022–2024 Ioniq 5 models for HV battery and charging system defects (including ICCU failure). My vehicle’s failure is consistent with this known defect pattern. Despite the vehicle being subject to this known systemic issue, Hyundai Motor America has declined to offer a goodwill buyback, and my case manager has stated the vehicle does not qualify for lemon law relief. The sudden loss of range and charging capability while the vehicle is in motion or in use presents a serious safety concern — particularly on highways where unexpected power loss could lead to accidents. I am currently without a vehicle for what Hyundai estimates to be several months. I am requesting NHTSA investigate this failure

---

[34] *NHTSA Complaint ID:* 11728824, NHTSA (Apr. 2, 2026), https://www.nhtsa.gov/?nhtsaId=11728824 (last visited Nov. 17, 2026).

pattern in 2022–2024 Hyundai Ioniq 5 vehicles and take appropriate action to protect consumers from this known defect.[35]

**August 19, 2026**, NHTSA CAMPAIGN NUMBER**:** 11757865
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11757865
**Incident Date:** June 22, 2026
**Consumer Location:** LOS ANGELES, CA
**Vehicle Identification Number:** KNDC44LA0P5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

ICCU failure. I charged overnight at my home L2 charging as usual. I backed out of my garage and heard a loud pop. Almost immediately an "check electrical" warning came up. The car went to turtle mode and then completely died. The car was towed and I was informed the ICCU needed to be replaced. The car had all previous checks on ICCU performed (per mailed recalls) and was updated and passed each time.[36]

**July 7, 2026,** NHTSA CAMPAIGN NUMBER: 11748828
**COMPONENT: ELECTRICAL SYSTEM, FUEL/PROPULSION SYSTEM**
**NHTSA ID Number:** 11748828
**Incident Date:** June 29, 2026
**Consumer Location:** SALT LAKE CITY, UT
**Vehicle Identification Number:** KM8KM4AE8NU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

Complaint Summary: Mandated federal safety recall remedies performed on my vehicle have directly induced a cascading, critical safety failure of the vehicle's high-voltage propulsion management system. My 2022 Hyundai IONIQ 5 (VIN: [XXX]) was brought to an authorized dealer on XXX at 200,224 miles to complete safety recall Campaign 272 / NHTSA Recall 24V-204 (ICCU Software Update and Fuse Inspection). After receiving this software flash, the vehicle's electrical charging system failed (DTC P0D5C00), requiring a full hardware replacement of the Integrated Charging Control Unit (ICCU) on XXX. 142 miles after the physical replacement of the high-voltage ICCU, the vehicle displayed an emergency battery malfunction message on the dashboard. Diagnostic scans reveal active fault code P1BC700 in the Battery Management System. The manufacturer's dealership is now charging $1,909.77 out-of-pocket to replace the Power Relay Assembly (PRA).The current recall modifications for the E-GMP platform are failing to safely mitigate high-voltage current spikes. The electrical strain or servicing procedure required by the recall has directly compromised the adjacent power relays. This creates

[35] *NHTSA Complaint ID:* 11752268, NHTSA (July 22, 2026), https://www.nhtsa.gov/?nhtsaId=11752268 (last visited Nov. 17, 2026).

[36] *NHTSA Complaint ID:* 11757865, NHTSA (Aug. 19, 2026), https://www.nhtsa.gov/?nhtsaId=11757865 (last visited Nov. 17, 2026).

a severe safety hazard, leaving drivers exposed to subsequent high-voltage component failure immediately after completing mandated federal safety recalls. NHTSA should investigate cascading high-voltage component failures occurring in vehicles directly following the completion of Recall 24V-204. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).[37]

**September 8, 2026,** NHTSA CAMPAIGN NUMBER: 11762654
**COMPONENT:** ELECTRICAL SYSTEM, FUEL/PROPULSION SYSTEM
**NHTSA ID Number:** 11762654
**Incident Date:** September 8, 2026
**Consumer Location:** SEATAC, WA
**Vehicle Identification Number:** KNDC34LA9R5******
**Crash: No Fire: No Injuries: 0 Deaths: 0**

My 2024 Kia EV6 is experiencing a total failure of the 12V charging system and requires manual jumpstarts to operate. The official ICCU safety recall (SC327) was previously performed, which is why the NHTSA database shows 0 unrepaired recalls for this VIN. However, the manufacturer's remedy has completely failed. Per NHTSA safety guidelines, this vehicle is currently subject to a sudden loss of motive power while driving and is unsafe to operate on public roads.[38]

**April 8, 2026,** NHTSA CAMPAIGN NUMBER: 11729945
**COMPONENT**: POWER TRAIN, ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11729945
**Incident Date:** April 5, 2026
**Consumer Location:** CHICAGO, IL
**Vehicle Identification Number:** N/A
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

I am submitting a safety complaint regarding a serious incident involving my 2025 Kia EV9. The vehicle was serviced on March 1 at World Kia in Joliet, Illinois. On April 4, only four days after that service, the vehicle experienced a sudden and unexpected ICCU failure while I was driving. During my normal travel, in active traffic and at speed, the vehicle abruptly entered limp mode and displayed multiple system warnings. This caused an immediate and significant reduction in power, creating a hazardous situation for myself and surrounding drivers. I was forced to maneuver the vehicle out of traffic while it was rapidly losing propulsion capability. The vehicle is currently at Berwyn Kia in Berwyn, Illinois for diagnosis and repair. I am reporting this incident due to the clear safety implications of a sudden loss of power

---

[37] *NHTSA Complaint ID:* 11748828, NHTSA (July 7, 2026), https://www.nhtsa.gov/?nhtsaId=11748828 (last visited Nov. 17, 2026).

[38] *NHTSA Complaint ID:* 11762654, NHTSA (Sept. 8, 2026), https://www.nhtsa.gov/?nhtsaId=11762654 (last visited Nov. 17, 2026).

during highway driving operation. A failure of this nature poses a risk of collision, especially in high-speed or congested traffic conditions. I am requesting that NHTSA review this issue as part of its ongoing monitoring of Kia/Hyundai/Genesis Integrated Charging Control Unit (ICCU) failures and related safety concerns. Thank you for your attention to this matter.[39]

**June 11, 2026,** NHTSA CAMPAIGN NUMBER: 11743386
**COMPONENT:** POWER TRAIN, ELECTRICAL SYSTEM, UNKNOWN
**NHTSA ID Number:** 11743386
**Incident Date:** June 1, 2026
**Consumer Location:** HENDERSON, NV
**Vehicle Identification Number:** KMUKEDTB2PU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

This complaint is in regards to Safety Recall 272 Component Failure and Vehicle Disabling / SOS System Failure On [XXX], at approximately [XXX] PM, I was driving my Genesis vehicle during rush hour when I heard a loud popping sound. Immediately following the sound, the dashboard displayed a critical warning light stating: "Electrical Charging System Fault — Check Electrical System." Because I was actively driving in heavy rush-hour traffic, this sudden loss of charging system functionality posed an immediate safety hazard. I pressed the in-vehicle "SOS" button to contact Genesis emergency services. The operator, who identified himself as "Eddie," refused to dispatch a tow truck to assist me. Instead, he offered to read a phone number aloud for me to write down. I explained that I was actively operating a malfunctioning vehicle in heavy traffic and could not safely write down information, but he still refused to call for emergency towing. I managed to safely limp the vehicle back to my residence and subsequently arranged for the local dealership, Genesis of Las Vegas, to tow the vehicle. On Friday, June 5, 2026, the dealership confirmed that the vehicle had suffered a failure of the Integrated Charging Control Unit (ICCU), which also destroyed the 12V battery. They informed me that this failure was directly tied to NHTSA Safety Recall 272 (Integrated Charging Control Unit). While the dealership performed the ICCU remedy, they are currently refusing to release my vehicle unless I pay $500.00 for the replacement of the 12V battery. Because the 12V battery was directly damaged as a consequential result of the recalled ICCU defect, it should be covered under the safety recall remedy and vehicle warranty. As of this reporting, the dealer is holding my vehicle hostage over this fee, and Genesis Motor America has failed to resolve the issue despite a formal complaint being filed with them. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).[40]

---

[39] *NHTSA Complaint ID:* 11729945, NHTSA (Apr. 8, 2026), https://www.nhtsa.gov/?nhtsaId=11729945 (last visited Nov. 17, 2026).

[40] *NHTSA Complaint ID:* 11743386, NHTSA (June 11, 2026), https://www.nhtsa.gov/?nhtsaId=11743386 (last visited Nov. 17, 2026).

**March 11, 2026**, NHTSA CAMPAIGN NUMBER: 11723510
**COMPONENT: VEHICLE SPEED CONTROL, ENGINE**
**NHTSA ID Number:** 11723510
**Incident Date:** February 6, 2026
**Consumer Location:** CHARLOTTE, NC
**Vehicle Identification Number:** KMUKB4SAXSU******
**Summary of Complaint**:
**Crash: No: Fire No: Injuries: 0 Deaths: 0**

My wife and I have both experienced intermittent power loss on the vehicle — specifically after stopping and restarting, such as at traffic signals. During these incidents, the car moves extremely slowly even with the accelerator fully pressed, before eventually resuming normal acceleration. This has happened 3–4 times between us, and on one occasion, the car nearly stalled in the middle of an intersection, which was genuinely frightening. I brought the vehicle to Genesis of Charlotte in mid-January 2026 for diagnosis. After multiple checks, the service team was unable to identify any issues and advised me to take the car back. When I asked whether they had checked with Genesis for any known reports of this issue, the service manager told me, "That's not how we work — we diagnose by ourselves." I was surprised by this response, as I have since found this issue reported by other GV60 owners online (including on community forums), suggesting it may be a broader, known concern.[41]

86. When ICCUs have been replaced, Defendants and their authorized dealerships have replaced the failed units with the same defective ICCUs. Some owners have reported experiencing multiple ICCU failures and replacements:[42]

**March 4, 2026,** NHTSA CAMPAIGN NUMBER: 11721954
**COMPONENT:** ELECTRICAL SYSTEM, VEHICLE SPEED CONTROL, FUEL/PROPULSION SYSTEM
**NHTSA ID Number:** 11721954
**Incident Date:** March 1, 2026
**Consumer Location:** CARMEL, IN
**Vehicle Identification Number:** KMUKCDSC9RU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

On March 1, 2026, while driving at normal roadway speed on a double yellow-lined road, my 2024 Genesis GV60 Advance displayed a "Check Electric Vehicle System" warning. With less than one minute of the warning appearing, the vehicle lost propulsion and rolled to a stop. I was able to steer into a parking lot, but I was stranded miles from home. There was minimal advance warning before complete loss of

[41] *NHTSA Complaint ID:* 11723510, NHTSA (Mar. 11, 2026), https://www.nhtsa.gov/?nhtsaId=11723510 (last visited Nov. 17, 2026).

[42] *See supra* note 4.

drive power. The vehicle could not be driven and required towing. The vehicle previously had the ICCU recall campaign marked as complete on January 3, 2025. Despite that prior recall remedy, the vehicle experienced sudden loss of propulsion. The vehicle is currently at the dealership for diagnosis and repair. The dealership has indicated extended diagnostic time and that related parts are on backorder. I am filing this compliant because sudden propulsion loss with little warning presents a significant safety risk to both occupants and surrounding traffic.[43]

**March 11, 2026**, NHTSA CAMPAIGN NUMBER: 11723556
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11723556
**Incident Date:** March 6, 2026
**Consumer Location:** ZEELAND, MI
**Vehicle Identification Number:** KNDC3DLC3N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

A warning came up on the dashboard to "Check electric vehicle system". 12v battery light also on. Vehicle went into limp mode and drove at 45 mph max for a period of time, then dropped to 27 mph max. Inspections at Ziegler Kia in Holland, MI, found the ICCU was faulty and needs to be replaced. This vehicle has already had the ICCU recall applied, yet ICCU has failed again.[44]

**March 9, 2026,** NHTSA CAMPAIGN NUMBER: 11723084
**COMPONENT:** POWER TRAIN, ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11723084
**Incident Date:** December 9, 2025
**Consumer Location:** FORT WAYNE, IN
**Vehicle Identification Number:** KNDC3DLC6N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The iccu failed on this car rendering the whole vehicle useless. This part is currently a recall and I was using a new ICCU with the software update per their recall solution. My second ICCU failed at approximately 40k miles.[45]

**February 23, 2026,** NHTSA CAMPAIGN NUMBER: 11719866
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11719866

---

[43] *NHTSA Complaint ID:* 11721954, NHTSA (Mar. 4, 2026), https://www.nhtsa.gov/?nhtsaId=11721954 (last visited Nov. 17, 2026).

[44] *NHTSA Complaint ID:* 11723556, NHTSA (Mar. 11, 2026), https://www.nhtsa.gov/?nhtsaId=11723556 (last visited Nov. 17, 2026).

[45] *NHTSA Complaint ID:* 11723084, NHTSA (Mar. 9, 2026), https://www.nhtsa.gov/?nhtsaId=11723084 (last visited Nov. 17, 2026).

**Incident Date:** February 10, 2026
**Consumer Location:** SAN JOSE, CA
**Vehicle Identification Number:** KNDC34LA4N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

vehicle will not charge properly due to ICCU failure, causing it to not charge the 12v battery which could have caused it to run out of battery at any moment causing the car to stop operating while driving which could have caused an accident, particularly because I do mostly highway driving. The dealership has confirmed the ICCU failure. While it supposedly got the previous recall fixes, that did not prevent it from failing.[46]

**January 28, 2026,** NHTSA CAMPAIGN NUMBER: 11714008
COMPONENT: ELECTRICAL SYSTEM
**NHTSA ID Number:** 11714008
**Incident Date:** December 7, 2025
**Consumer Location:** Unknown
**Vehicle Identification Number:** KM8KRDAF9NU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

ICCU Failure caused car to lose all motive power. Car held at dealer for 18 days until replacement part could be procured. ICCU reprogramming recall had been completed on the vehicle. Part failed anyway.[47]

**January 26, 2026,** NHTSA CAMPAIGN NUMBER: 11713434
**COMPONENT:** STEERING, POWER TRAIN, ELECTRICAL SYSTEM
**NHTSA ID Number:** 11713434
**Incident Date:** December 19, 2025
**Consumer Location:** BELLEFONTE, PA
**Vehicle Identification Number:** KM8KMDAF6NU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

After a loud bang (fuse blown) the car was unable to move just before I was about to turn into an intersection. The ICCU failed for the second time, all warranty repair completed prior to the incident, first failure occurred in 2024. Both failures occurred close to a when the lead acid battery failed and needed replacement. When the car was stopped and started again, I was able to drive the car slowly to the dealership located less then 1/4 mile away. The car behaved as if there was no power steering but the car still jerked the wheel around to try to put me back into the driving lane presumably because I was driving in the

---

[46] *NHTSA Complaint ID:* 11719866, NHTSA (Feb. 23, 2026), https://www.nhtsa.gov/?nhtsaId=11719866 (last visited Nov. 17, 2026).

[47] *NHTSA Complaint ID:* 11714008, NHTSA (Jan. 28, 2026), https://www.nhtsa.gov/?nhtsaId=11714008 (last visited Nov. 17, 2026).

emergency lane. Failed component was ICCU Module 36400-1XAA0. Vehicle was unsafe because I was unable to move while about to turn into an intersection. After stopping and starting the car, the was drive-able bit mildly erratic when attempting to move the car to a safe location (out of the left turning lane). Problem was identified, confirmed, and repaired by dealer under warranty for second time. Component and vehicle inspected by dealer. Failed part sent back to manufacturer. This incident occurred without any prior warning or indication by the vehicle. There were no active recalls on the vehicle at the time of the incident.[48]

**November 28, 2025, NHTSA CAMPAIGN NUMBER: 11701871**
**COMPONENT:** POWER TRAIN, ELECTRICAL SYSTEM, FUEL/ PROPULSION SYSTEM
**NHTSA ID Number:** 11701871
**Incident Date:** November 19, 2025
**Consumer Location**: SOUTH KINGSTOWN, RI
**Vehicle Identification Number:** KM8KNDAF9NU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

Electric Drive System Inoperable, sustained an immediate failure upon engaging in Drive mode. Dashboard lit up with warning lights and messages. Luckily was just pulling out onto road when vehicle completely died. Tow service unable to start vehicle with jumper module. After being towed to dealer, was diagnosed with failed ICCU. The original ICCU was replaced previously in January 2025. Luckily was not underway on the road when it happened. There was no warning, no indication that there was any problem.[49]

**February 27, 2026**, NHTSA CAMPAIGN NUMBER: 11721059
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11721059
**Incident Date:** January 23, 2026
Consumer Location: EDMONDS, WA
**Vehicle Identification Number:** KM8KNDAF3PU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

On the morning of January 23, 2026, the ICCU Assembly and fuse failed when driving on a freeway in moderately heavy traffic. I was driving about 55 mph when I heard a pop from somewhere behind me. A warning message came on the display to check the electrical system along with a battery symbol. The car lost power. Losing power like that on a freeway was not at all safe. It could only go about 25 miles per hour. I had to drive on the shoulder of the freeway with my hazard lights flashing until I reached an exit ramp to get off the freeway. I parked on

---

[48] *NHTSA Complaint ID:* 11713434, NHTSA (Jan. 26, 2026), https://www.nhtsa.gov/?nhtsaId=11713434 (last visited Nov. 17, 2026).

[49] *NHTSA Complaint ID:* 11701871, NHTSA (Nov. 28, 2025), https://www.nhtsa.gov/?nhtsaId=11701871 (last visited Nov. 17, 2026).

a side street in a residential area where I felt safe, turned off the car, and waited. I turned it back on. The message was still there so I called for a tow. The 12-volt battery was completely dead by the time it got to the dealers and had to be jumped to be able to park it. The original ICCU had already been replaced in November of 2024, so this was a failure of a replaced part. The car was at the dealer for 19 days before it was repaired due to the wait for the parts to be shipped. What component or system failed or malfunctioned, and is it available for inspection upon request? The ICCU and fuse failed but I don't have the part since it was replaced by the dealer. How was your safety or the safety of others put at risk? Losing power on a freeway when cars are traveling at high speed is not at all safe. I could have been rear-ended. Luckily I was able to get to the freeway shoulder without incident and travel on the shoulder to get to a safe place. Has the problem been reproduced or confirmed by a dealer or independent service center? Yes. They diagnosed it and replaced the failed part. Has the vehicle or component been inspected by the manufacturer, police, insurance representatives or others? Unknown. Were there any warning lamps, messages or other symptoms of the problem prior to the failure, and when did they first appear? No. The warning message popped up at the same time as the loss of power.[50]

**February 24, 2026,** NHTSA CAMPAIGN NUMBER: 11720055
**COMPONENT:** UNKNOWN OR OTHER
**NHTSA ID Number:** 11720055
**Incident Date:** January 21, 2026
**Consumer Location:** PITTSBURGH, PA
**Vehicle Identification Number:** KM8KNDAF8PU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The component that failed was the Integrated Charging Control Unit (ICCU). This component has failed twice within the past ten months. The failed components are not available for inspection, as they were replaced during prior service repairs. The failure created a significant safety risk because it resulted in a sudden loss of normal vehicle function without advance warning during operation. This placed both myself and others on the road at risk, as the vehicle could become disabled unexpectedly while being driven. The issue has been inspected and confirmed by dealer-authorized mechanics following each occurrence. There were no earlier symptoms prior to the moment of failure. Warning messages related to the vehicle's electrical system appeared only at the time the malfunction occurred. At the time of each incident, the failure occurred without advance warning during operation. Failures of the ICCU are believed to occur due to electrical overcurrent and thermal stress damaging internal power components during high-voltage to low-voltage conversion. When these internal components fail, the system may no longer maintain the 12V electrical supply, which can lead to loss of vehicle function or sudden loss of

[50] *NHTSA Complaint ID:* 11721059, NHTSA (Feb. 27, 2026), https://www.nhtsa.gov/?nhtsaId=11721059 (last visited Nov. 17, 2026).

motive power during operation. Software updates have been issued to address the issue, but failures have continued to occur.[51]

## C. Defendants Knew About the ICCU Defect

87. Defendants knew or should have known of the ICCU Defect prior to taking the Class Vehicles to market. Indeed, as part of Defendants research, development, and pre-sale testing of the Class Vehicles, Defendants performed various tests that replicate actual consumer use of the ICCU over hundreds or thousands of miles. As part of that testing and research, Defendants knew or should have learned of the ICCU Defect and that the ICCUs prematurely fail, thereby presenting a safety hazard and having a material impact on the reliability of the Class Vehicles.

88. Defendant Hyundai had knowledge of the ICCU Defect as early as October 2022. According to Hyundai's chronology submitted to NHTSA, beginning in October 2022, Hyundai began examining ICCU warranty returns from various markets and identified heat damage to the low-voltage converter field-effect transistors ("FETs") within the ICCU assemblies. By January 2023, Hyundai was evaluating potential overcurrent conditions in the ICCU in an effort to replicate the failures observed in returned warranty parts.[52]

89. Defendant Kia likewise had knowledge of the ICCU Defect no later than May 10, 2023, when Kia North America's Safety Office provided NHTSA with information concerning the ICCU and associated limp-home condition in 2022–2023 Kia EV6 vehicles.[53]

90. Defendants also became aware of the ICCU Defect after launching the Class Vehicles, but before Plaintiffs and other Class Members purchased the Class

---

[51] *NHTSA Complaint ID:* 11720055, NHTSA (Feb. 24, 2026), https://www.nhtsa.gov/?nhtsaId=11720055 (last visited Nov. 17, 2026).

[52] *See supra* note 18.

[53] *See supra* note 17.

Vehicles, by way of the numerous consumer complaints about the issue. Instances of the ICCU failures are widespread, and Defendants are aware of them, not only because Plaintiffs and Class Members brought them to Defendants' attention by bringing their vehicles to Defendants' authorized dealers but also because of the many complaints lodged by consumers with NHTSA, with Defendants directly, and in online forums that Defendants, on information and belief, monitor.

91. NHTSA maintains a database of motor-vehicle consumer complaints submitted since January 2000. Consumers can submit complaints online or by phone in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, and a description of the incident. Defendants have an obligation to monitor the NHTSA database to identify potential defects in their vehicles, pursuant to the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

92. There are more than 400 NHTSA complaints regarding the ICCU Defect. Below are some samples that illustrate Class Members' experiences, including some from shortly after original launch of the earliest Class Vehicles:

> **February 22, 2023,** NHTSA CAMPAIGN NUMBER: 11508521
> **Components:** ELECTRICAL SYSTEM
> **NHTSA ID Number:** 11508521
> Incident Date: January 19, 2023
> **Consumer Location:** CORAM, NY
> **Vehicle Identification Number:** KM8KMDAF9NU******
> **Summary of Complaint**
> **Crash: No Fire: No Injuries: 0 Deaths: 0**
>
> The contact owns a 2022 Hyundai Ioniq 5. The contact stated while driving 59 MPH, a warning message advising to stop the vehicle due to low battery was displayed; however, the main battery was fully charged. The instrument panel lights turned off and the vehicle decelerated to 23 MPH. The contact veered to the right lane. While driving to the dealer, the vehicle stalled. The vehicle was towed to the dealer, where the Integrated Charging Control Unit (ICCU) assist, and the high voltage fuse were upgraded. Additionally, the battery was replaced. The vehicle was not repaired and remained at the dealer. The manufacturer was notified of the failure and informed the contact they

could not provide vehicle rental assistance because the dealer was unwilling to assist. The failure mileage was approximately 28,000.[54]

**April 17, 2023,** NHTSA CAMPAIGN NUMBER: 11517383
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11517383
**Incident Date:** April 15, 2023
**Consumer Location:** EL DORADO HILLS, CA
**Vehicle Identification Number:** KMUKEDTB6PU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

We drove ten miles to a local restaurant and after our meal the vehicle reported a 12-volt battery issue. After about a mile the car started to pull the car over as the battery was falling. As we were looking for a safe location to pull over, the car would no longer accelerate and would maintain 20 mph on a road that was 50 mph speed limit causing a very unsafe condition. We eventually found a safe location to pull over the car and had the car towed.[55]

**June 27, 2023,** NHTSA CAMPAIGN NUMBER: 11529138
**COMPONENT:** POWER TRAIN
**NHTSA ID Number:** 11529138
**Incident Date:** June 26, 2023
**Consumer Location:** LOS ANGELES, CA
**Vehicle Identification Number:** KMUKEDTBXPU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The contact leased a 2023 Genesis GV60. The contact stated that after he started the vehicle, the vehicle failed to shift in the intended gear. The contact stated that the ignition switch light flashed. The vehicle was towed to the dealer but was not yet diagnosed. The vehicle was not repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 3,600. The contact received three more notification of defects in the GV 60 vehicle. The notifications are as follows: Regenerative Brake Light Logic, Integrative Charging Control Unit, and Seat Belt Pretensioner.[56]

**November 3, 2024,** NHTSA CAMPAIGN NUMBER: 11623361
**Components:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11623361
**Incident Date:** November 1, 2024
**Consumer Location:** MERCER ISLAND, WA

[54] *NHTSA Complaint ID:* 11508521, NHTSA (Feb. 22, 2023), https://www.nhtsa.gov/?nhtsaId=11508521 (last visited Nov. 17, 2026).

[55] *NHTSA Complaint ID:* 11517383, NHTSA (Apr. 17, 2023), https://www.nhtsa.gov/?nhtsaId=11517383 (last visited Nov. 17, 2026).

[56] *NHTSA Complaint ID:* 11529138, NHTSA (June 27, 2023), https://www.nhtsa.gov/?nhtsaId=11529138 (last visited Nov. 17, 2026).

**Vehicle Identification Number:** 5NMMCET15PH******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

Genesis GV70 Electrified with 15,818 miles. Car suddenly would not accelerate beyond 20 mph and RED Warning on dashboard to immediately pull over and stop car. No prior warning or symptoms. Significant concern for safety of my passenger and myself due to driving much lower than speed limit on road, in wet conditions. Thankfully, I was not on a freeway or major intersection. Called Genesis dealership, and service manager confirmed the defective part is the ICCU, which was already on NHTSA recall and was reprogrammed earlier this year on my car. Same issue occurred, but this time the dealership plans to replace the part. Why was this not replaced the first time if it can go bad? This should be a required replacement, not reprogramming. This is the SECOND major power failure on my car within 1-1/2 yrs of ownership and only 15,818 miles driven. Seems like significant issues on this car, maybe a lemon?[57]

**April 25, 2025,** NHTSA CAMPAIGN NUMBER: 11656777
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11656777
**Incident Date:** April 11, 2025
**Consumer Location:** Unknown
**Vehicle Identification Number:** KMUKCDSC5SU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The 12 volt battery on the EV car has gone dead twice since I took delivery on the new car in January 2025. When that happens the car is completely dead and must be manually accessed to open the hood and jump start the car. The first time the car would function once jump started. The second time the car would not stay "running" and the battery had to be recharged for the car to function. This problem seems to be the same as the issue that prompted the recall of this car and others in the fall of 2024. It appears that the problem was not corrected in new cars produced.[58]

**May 5, 2023**, NHTSA CAMPAIGN NUMBER: 11520591
**COMPONENT**: ELECTRICAL SYSTEM
**NHTSA ID Number:** 11520591
**Incident Date:** April 19, 2023
**Consumer Location:** Unknown
**Vehicle Identification Number:** KNDC3DLC3N5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

---

[57] *NHTSA Complaint ID:* 11623361, NHTSA (Nov. 3, 2024), https://www.nhtsa.gov/?nhtsaId=11623361 (last visited Nov. 17, 2026).

[58] *NHTSA Complaint ID:* 11656777, NHTSA (Apr. 25, 2025), https://www.nhtsa.gov/?nhtsaId=11656777 (last visited Nov. 17, 2026).

I was driving my less than 1 year old, only 10,000 miles Kia EV6 First Edition when I got an error message to 'Check Vehicle Electric System'. After about another 2 miles I got a warning to "Stop Vehicle and Check Power Supply." As I attempted to find a safe place to stop, my vehicle started throttling my speed down to only 20mph (I was on a 55mph road). I was able to pull off and into a parking lot, but when I turned the vehicle off, it was completely dead and would not restart. Note, the battery was charged to 83% at the time of this incident. I had the vehicle towed the Kia Service Center at the dealership where I purchased the vehicle. After 5 days, they informed me that the ICCU had failed. Per their website, the Integrated Charging Control Unit, or ICCU, is a newly developed integrated charging system by Hyundai that charges both the high-voltage and spare batteries, essential to allowing for V2L (Vehicle to Load) feature. It has now been 20 days since the incident and Kia has no idea when a replacement part will be available.[59]

**April 10, 2024,** NHTSA CAMPAIGN NUMBER: 11582116
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11582116
**Incident Date:** March 30, 2024
**Consumer Location:** AMITY, OR
**Vehicle Identification Number:** KNDC3DLC6P5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

2023 EV6 - The car gave a warning to check the electrical system. Called the dealer and they said to drive it to them. One minute later the tortuous symbol came on as well as the 12v battery. The car had no power even when the accelerator was pressed fully. Parked the car and the dash shut down. Towed the car to the closest Kia dealer and they diagnosed it as a faulty ICCU and Main Fuse. Only ONE in the entire United States. Unknown date of fix. Left me stranded as well as in a dangerous position.[60]

**January 17, 2025**, NHTSA CAMPAIGN NUMBER: 11636530
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11636530
**Incident Date:** January 13, 2025
**Consumer Location:** COMMACK, NY
**Vehicle Identification Number:** KNDC3DLC5R5******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

I was coming home from work on 1/13/2025 and got an alert. a red circle saying pull over and check the electrical system. when i pulled over the best i could the car went dark. i called Kia for road assistance

---

[59] *NHTSA Complaint ID:* 11520591, NHTSA (May 5, 2023), https://www.nhtsa.gov/?nhtsaId=11520591(last visited Nov. 17, 2026).

[60] *NHTSA Complaint ID:* 11582116, NHTSA (Apr. 10, 2024), https://www.nhtsa.gov/?nhtsaId=11582116 (last visited Nov. 17, 2026).

and they dispatched a tow to the dealer. the next day the dealer called and told me the ICCU needs to be changed and arranged a loaner car for me. The Dealer has been very helpful throughout this ordeal thus far.[61]

**October 28, 2023,** NHTSA CAMPAIGN NUMBER: 11552424
**COMPONENT:** ELECTRICAL SYSTEM, ENGINE
**NHTSA ID Number:** 11552424
**Incident Date:** October 28, 2023
**Consumer Location:** NEWARK, DE
**Vehicle Identification Number:** KM8KRDAF1PU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

I started getting the error Electric Vehicle System error in my month old Ioniq 5. After driving a few miles, the air conditioning stopped working completely. And after a few more miles, the vehicle started to throttle down the speed to 20-25mph that too on the I95 with a 65mph speed limit. Had to turn on the emergency lights and drive slowly till I reached my destination. After googling for a while, I found that this issue is related to the ICCU failure that is pretty common in the Ioniq 5 and Hyundai is yet to issue a permanent fix for this problem. I don't know why we are allowing the sale of these vehicles with known issues. You can even Reddit the ICCU issue.[62]

**January 3, 2025,** NHTSA CAMPAIGN NUMBER: 11633907
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11633907
**Incident Date:** December 20, 2024
**Consumer Location:** TUCSON, AZ
**Vehicle Identification Number:** KM8KM4DEXRU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The contact owns a 2024 Hyundai Ioniq 5. The contact received notification of NHTSA Campaign Number: 24V868000 (ELECTRICAL SYSTEM); however, the part to do the recall repair was unavailable. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the issue. The contact had not experienced a failure. Parts distribution disconnect.[63]

**February 2, 2025,** NHTSA CAMPAIGN NUMBER: 11640156

---

[61] *NHTSA Complaint ID:* 11636530, NHTSA (Jan. 17, 2025), https://www.nhtsa.gov/?nhtsaId=11636530 (last visited Nov. 17, 2026).

[62] *NHTSA Complaint ID:* 11552424, NHTSA (Oct. 28, 2023), https://www.nhtsa.gov/?nhtsaId=11552424 (last visited Nov. 17, 2026).

[63] *NHTSA Complaint ID:* 11633907, NHTSA (Jan. 3, 2025), https://www.nhtsa.gov/?nhtsaId=11633907 (last visited Nov. 17, 2026).

**COMPONENT:** POWER TRAIN, ELECTRICAL SYSTEM, FUEL/ PROPULSION SYSTEM
**NHTSA ID Number:** 11640156
**Incident Date:** January 23, 2025
**Consumer Location:** SUNNYVALE, CA
**Vehicle Identification Number:** KM8KRDDF4RU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

Our 8-mo old 9800 mile Ioniq 5 failed to maintain its 12v battery while parked for a week. It was dead when we came back to it. Jump started successfully. I replaced the OEM battery with an AGM battery, which the car failed to maintain charge on after 2 weeks. At that time, while driving, the car displayed "Stop vehicle and check power supply" and "check vehicle electrical system." I had a battery monitor installed which showed the car only had 44% charge left in a new 12v battery. By the time we made it to the dealer 15 minutes away, the car was barely above 20% on its battery, and was about to stop on the road. The car has been diagnosed with an ICCU failure and replacement parts are 2+ months backordered. This car appears to brick itself without much warning to the driver -- and clearly Hyundai's software-only recalls are not fixing the root cause of this dangerous safety issue.[64]

**October 17, 2025,** NHTSA CAMPAIGN NUMBER: 11694053
**COMPONENT:** ELECTRICAL SYSTEM, FUEL/PROPULSION SYSTEM
**NHTSA ID Number:** 11694053
**Incident Date:** October 7, 2025
**Consumer Location:** CHINO, CA
**Vehicle Identification Number:** 7YAKM4DA4SY******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The ICCU unit has failed after 10 days of driving of the brand new 2025 Ioniq 5. It gave me a warning that the battery has failed while I was waiting on a signal light, and the car started limiting my speed. The car continued to get slower and slower, then it says battery regeneration failed at one point. The fastest I could go at one point was 30 mph. It was dangerous as I need to make sure the cars behind me don't come at me. When going uphill, I was only able to drive in 20mph. The car was taken back to the dealership to get serviced. They confirmed that the ICCU unit and the fuse have failed and my car will need a replacement.[65]

**December 27, 2025,** NHTSA CAMPAIGN NUMBER: 11707241
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11707241

---

[64] *NHTSA Complaint ID:* 11640156, NHTSA (Feb. 2, 2025), https://www.nhtsa.gov/?nhtsaId=11640156 (last visited Nov. 17, 2026).

[65] *NHTSA Complaint ID:* 11694053, NHTSA (Oct. 17, 2025), https://www.nhtsa.gov/?nhtsaId=11694053 (last visited Nov. 17, 2026).

**Incident Date:** December 25, 2025
**Consumer Location:** BOONE, NC
**Vehicle Identification Number:** KM8KNDA84SU******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

What happened to me is a common problem with these models. I had an issue with the 12 V battery not being charged by the main battery as it should be. This led to a blowing of the main fuse which took out the ICCU unit. This seems to be fairly prevalent from what I can tell from online forums, and there needs to be a recall from Hyundai.[66]

**January 20, 2025,** NHTSA CAMPAIGN NUMBER: 11637082
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11637082
**Incident Date:** January 13, 2025
**Consumer Location:** KLAMATH FALLS, OR
Vehicle Identification Number: KMHM54AC4PA******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

4 days after having recall 272 performed by the dealer the ICCU on the vehicle failed. Warning lights indicated failure and to stop the vehicle. Luckily, only 1 mile from home and drove it home under reduced power . Called the dealer (70 miles away) and was told to tow the car to them. Car was diagnosed with ICC failure. Replacement had to be ordered but might take at least 4 weeks.[67]

**January 29, 2025**, NHTSA CAMPAIGN NUMBER: 11639430
**COMPONENT**: ELECTRICAL SYSTEM, UNKNOWN OR OTHER
**NHTSA ID Number:** 11639430
**Incident Date:** December 1, 2024
**Consumer Location:** ORLANDO, FL
**Vehicle Identification Number:** KMHM34AAXRA******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

I had my first ICCU recall issue, it was taken care of at Holler Hyundai in Orlando, Florida. I don’t even remember seeing a recall email sent out to me, or even a call given about the ongoing recall issues. I found out about the ICCU issues from Reddit of all places, but post after post of people detailing their issues. My concern is that there’s numerous post, about EV battery failure while driving or getting ready to take a trip. Imagine getting locked out of your car in freezing temperatures? Due to it being an EV it’s a lot more difficult to start or get in, and I don’t always carry my physical key. I only received on key, so imagine if I lose that one. You can’t use the app or key fob to get in, cause

---

[66] *NHTSA Complaint ID:* 11707241, NHTSA (Dec. 27, 2025), https://www.nhtsa.gov/?nhtsaId=11707241 (last visited Nov. 17, 2026).

[67] *NHTSA Complaint ID:* 11637082, NHTSA (Jan. 20, 2025), https://www.nhtsa.gov/?nhtsaId=11637082 (last visited Nov. 17, 2026).

everything works off the 12v battery which is in operable at that point. Hyundai is not addressing this issue with its customers, or even potential customers which is disheartening. It only takes one fatal mistake before something horrible happens. At this point I don't feel safe driving it, definitely won't plan any trip more than 20 miles. Have you guys heard any news on the ICCU issue, what's causing it mechanical, software or otherwise?[68]

**November 21, 2025,** NHTSA CAMPAIGN NUMBER: 11700722
**COMPONENT:** ELECTRICAL SYSTEM, UNKNOWN OR OTHER
**NHTSA ID Number:** 11700722
**Incident Date:** November 14, 2025
**Consumer Location:** Unknown
**Vehicle Identification Number:** KMHM54AC8SA******
**Summary of Complaint**
**Crash: No Fire: No Injuries: 0 Deaths: 0**

The ICCU had a failure and fuse also blew; vehicle needs those parts replaced. After reading about ICCU recalls, my vehicle was not in the last recall. It affected 2023-2025 models I started up my car in morning and was about to reverse out of my driveway. I heard a pop near the rear of my vehicle and then saw a "Check Electric Vehicle System" warning and battery light indicator on my dashboard. I tried driving around for a couple of minutes around my area, the car would not accelerate over 20-25 mph. I returned home and looked up the issue. My Hyundai app showed a Diagnostic Code of DTC P1A9096, which is related to the ICCU. I already have my car at a local Hyundai dealership to get it repaired under warranty but if it wasn't, I can only imagine the price it would cost to get this repaired. There should be more recalls.[69]

**April 28, 2025,** NHTSA CAMPAIGN NUMBER: 11657192
**COMPONENT:** ELECTRICAL SYSTEM
**NHTSA ID Number:** 11657192
**Incident Date:** April 12, 2025
**Consumer Location:** HAYMARKET, VA
**Vehicle Identification Number:** 5NMMCET14PH******
Summary of Complaint
**Crash: No Fire: No Injuries: 0 Deaths: 0**

ICCU failed leaving me stranded on the side of the road (thankfully not on bridge). This was supposed to have been fixed under a recall the week prior by reprogramming the computer. Genesis has not changed the ICCU so even if/when repaired, it will most likely happen again.

[68] *NHTSA Complaint ID:* 11639430, NHTSA (Jan. 29, 2025), https://www.nhtsa.gov/?nhtsaId=11639430 (last visited Nov. 17, 2026).

[69] *NHTSA Complaint ID:* 11700722, NHTSA (Nov. 21, 2025), https://www.nhtsa.gov/?nhtsaId=11700722 (last visited Nov. 17, 2026).

> The Genesis of Wexford, PA dealer confirmed ICCU and fuse blown. "Stop vehicle and check power supply" warning light came on.[70]

93. Had the Defendants truthfully disclosed and reported that their ICCUs were defective, Plaintiffs and Class Members would have been less likely to purchase or lease the Class Vehicles, would have declined to purchase or lease them altogether, or would have paid substantially less for them. As a direct and proximate result of Defendants' conduct, including their manufacture and sale of the Class Vehicles equipped with the ICCU Defect, misrepresentations, omissions, and breaches of warranty as detailed herein, Plaintiffs and Class Members purchased or leased the Class Vehicles and suffered damages.

94. Plaintiffs and the Class Members who purchased vehicles with defective ICCUs did not get the benefit of the bargain they struck. Instead, they received vehicles containing defective ICCUs that were prone to failure and that did not provide the reliability, functionality, and safety that Defendants represented and that reasonable consumers expected. The Class Vehicles were therefore worth less than Plaintiffs and Class Members paid for them. Accordingly, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including overpayment, repair, towing and other out-of-pocket expenses, and loss of use.

## V. RULE 9(B) ALLEGATIONS

95. To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Fed. R. Civ. P. 9(b) by establishing the following elements with sufficient particularity:

96. **WHO**: Defendants sold and leased Class Vehicles to consumers nationwide without disclosing the ICCU Defect to Plaintiffs and Class Members in

[70] *NHTSA Complaint ID:* 11657192, NHTSA (Apr. 28, 2025), https://www.nhtsa.gov/?nhtsaId=11657192 (last visited Nov. 17, 2026).

warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere, and then failed to adequately repair the defective ICCUs.

97. **WHAT**: Defendants failed to disclose and then adequately repair a uniform and widespread defect in the ICCUs installed in the Class Vehicles that causes the 12-volt batteries to repeatedly lose their charge.

98. **WHERE**: Defendants' violations of statutory and common law are conducted through their warranty manuals, websites, advertisements, Monroney stickers, and elsewhere.

99. **WHEN**: Defendants have been selling and leasing defective vehicles for years, and the conduct is ongoing. Information as to precisely how long Defendants have been selling and leasing defective vehicles is exclusively in the possession of Defendants. But Defendants' wrongful conduct occurred at the point of sale or lease of each Class Vehicle.

100. **WHY**: Defendants sell and lease defective vehicles to generate revenue without expending the costs necessary to cure the Defect, and to induce consumers into purchasing vehicles they otherwise would not have purchased, or would have paid significantly less for than they did. As a direct result of this conduct, Defendants have reaped substantial revenues at the expense of unsuspecting consumers.

101. **HOW**: Defendants sell and lease Class Vehicles to consumers nationwide without disclosing the defective ICCUs to Plaintiffs and Class Members in warranty manuals, on Defendants' websites, in advertisements, on Monroney stickers, or elsewhere, and then fail to adequately repair the defective ICCUs. Defendants' conduct violated consumer protection laws and the common law as alleged in detail above and below.

## VI. CALIFORNIA LAW APPLIES TO NATIONWIDE CLAIMS

102. California law applies to Plaintiffs' nationwide claims because Plaintiffs' injuries emanate from Hyundai's and Kia's actions in California. Each

pertinent decision related to the decision to conceal the ICCU Defect from Class Members, including the marketing, commercial distribution, and recall process for the Class Vehicles in the United States, was made from Hyundai's and Kia's California headquarters by their respective executives and employees located in California.

103. Defendant Hyundai Motor America, Inc. is headquartered in Fountain Valley, California and is the entity in the United States responsible for distributing, selling, leasing, and warranting the Hyundai Class Vehicles.

104. Hyundai Motor America, Inc. maintains its C-suite, executives, and its product planning, marketing, customer relations, and warranty departments at its Fountain Valley offices.

105. Randy Parker was appointed the Chief Executive Officer of Hyundai Motor America, Inc. in August 2022 and continues to serve in that role presently.[71] "Parker is responsible for leading all of Hyundai's operations and functions in the U.S., Canada and Mexico, plus Genesis in the U.S. and Canada. He also provides oversight for Hyundai's manufacturing facilities in Alabama and Georgia."[72] Parker was also appointed as the Chief Executive Officer of Hyundai and Genesis Motor North America in January 2025, although he also maintains his role as CEO of

---

[71] *Randy Parker named Chief Executive Officer of Hyundai and Genesis Motor North America*, AUTOMOTIVE WORLD (Dec. 11, 2024), https://www.automotiveworld.com/news/randy-parker-named-chief-executive-officer-of-hyundai-and-genesis-motor-north-america/ (last visited Nov. 17, 2026).

[72] *Randy Parker*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/randy-parker (last visited Nov. 17, 2026).

Hyundai Motor America, Inc.[73] Parker is based in Hyundai's Fountain Valley, California headquarters.[74]

106. Before Parker, Josè Muñoz was the "president and global chief operating officer and president and CEO of Hyundai and Genesis Motor North America, where he oversaw consecutive record sales" from approximately 2019 to 2024.[75] Munoz was promoted to President and Chief Executive Officer of Hyundai Motor Company in January 2025.[76] Munoz served in these roles from Hyundai's Fountain Valley, California headquarters.[77]

107. Claudia Marquez was appointed the Chief Operating Officer of Hyundai Motor America, Inc. in January 2025 and continues to serve in that role presently.[78] In her role, Marquez oversees "all sales, distribution, product line management and aftersales activities, as well as shared responsibility for dealer network development for Hyundai vehicles in the U.S., driving profitable sales and market share growth. She [is] responsible for executing comprehensive sales and after-sales strategies and programs designed to optimize dealer performance,

---

[73] *Randy Parker named Chief Executive Officer of Hyundai and Genesis Motor North America*, AUTOMOTIVE WORLD (Dec. 11, 2024), https://www.automotiveworld.com/news/randy-parker-named-chief-executive-officer-of-hyundai-and-genesis-motor-north-america/ (last visited Nov. 17, 2026).

[74] *Randy Parker*, LINKEDIN, https://www.linkedin.com/in/randy-parker-24806232/ (last visited Nov. 17, 2026).

[75] *Jose Munoz*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/jose-munoz (last visited Nov. 17, 2026).

[76] *Jose Munoz*, LINKEDIN, https://www.linkedin.com/in/jos%C3%A9-mu%C3%B1oz/ (last visited Nov. 17, 2026).

[77] *Id.*

[78] *Claudia Marquez Named Chief Operating Officer of Hyundai Motor America*, PR NEWSWIRE (Jan. 14, 2025), https://www.prnewswire.com/news-releases/claudia-marquez-named-chief-operating-officer-of-hyundai-motor-america-302350434.html (last visited Nov. 17, 2026).

strengthen dealer relationships, enhance customer experience, and ensure effective market representation."[79] Marquez is based in Hyundai's Fountain Valley, California headquarters.[80]

108. Barry Ratzlaff was appointed the Chief Customer Officer of Hyundai Motor America, Inc. in October 2019 and continues to serve in that role presently.[81] In his role, Ratzlaff "is responsible for Hyundai's customer experience strategy, retail process, sales and service training, product quality and service engineering." Ratzlaff is based in Hyundai's Fountain Valley, California headquarters.[82]

109. Cole Stutz was appointed the Chief Safety Officer of Hyundai Motor America, Inc. in January 2024 and continues to serve in that role presently.[83] "Stutz leads all safety endeavors, including management and compliance with safety regulations for North America."[84] Stutz is based in Hyundai's Fountain Valley, California headquarters.[85]

---

[79] *Id.*

[80] *Claudia Marquez*, LINKEDIN, https://www.linkedin.com/in/claudia-marquez-93557253/ (last visited Nov. 17, 2026).

[81] *Barry Ratzlaff*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/barry-ratzlaff (last visited Nov. 17, 2026); *Barry Ratzlaff*, LINKEDIN, https://www.linkedin.com/in/barry-ratzlaff-54b40811/ (last visited Nov. 17, 2026).

[82] *Barry Ratzlaff*, LINKEDIN, https://www.linkedin.com/in/barry-ratzlaff-54b40811/ (last visited Nov. 17, 2026).

[83] *Cole Stutz*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/cole-stutz (last visited Nov. 17, 2026).

[84] *Id.*

[85] *Cole S.*, LINKEDIN, https://www.linkedin.com/in/cole-s-2b7796103/ (last visited Nov. 17, 2026).

110. Stutz succeeded Brian Latouf, who was Hyundai Motor North America's Chief Safety Officer from approximately December 2019 to July 2022.[86] Latouf was promoted to and served as Hyundai Motor Company's Global Chief Safety Officer from approximately July 2022 to December 2023, and is currently the President and Global Chief Safety and Quality Officer for Hyundai Motor Group.[87] Latouf "is responsible for leading global safety and quality for Hyundai, Genesis and Kia. He has full authority to modify and enhance existing safety and quality systems and processes to drive a path to common global standards and best practices. His scope of leadership includes field issues, safety recalls, safety-based field actions for service campaigns, extended warranties, and other responsibilities. He also oversees the entire Quality Division, including the processes within R&D and quality gates in preparation for vehicle launches."[88] He is "based in California with offices at Hyundai Motor Group global headquarters in Seoul and at the Hyundai Safety Test and Investigation Laboratory in Michigan."[89]

111. Sean Gilpin is the Chief Marketing Officer of Hyundai Motor America, Inc.[90] He has been in this role from August 2024 to present.[91] Gilpin "leads the

---

[86] *Hyundai Motor Appoints Brian Latouf to Lead New Global Safety Office*, HYUNDAI (July 19, 2022), https://www.hyundainews.com/assets/documents/original/50549-PressReleaseHyundaiMotorAppointsBrianLatouftoLeadNewCustomerSafetyOffice0719.pdf (last visited Nov. 17, 2026); *Brian Latouf*, LINKEDIN, https://www.linkedin.com/in/brian-latouf-b6a8b7b4/ (last visited Nov. 17, 2026).

[87] *Id.*; *Brian Latouf*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/brian-latouf- (last visited Nov. 17, 2026).

[88] *Id.*

[89] *Id.*

[90] *Sean Gilpin*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/sean-gilpin (last visited Nov. 17, 2026).

[91] *Sean Gilpin*, LINKEDIN, https://www.linkedin.com/in/gilpinsean/ (last visited Nov. 17, 2026).

marketing function for Hyundai's U.S. business overseeing both creative and performance" and "[h]is responsibilities include marketing strategy, creative execution, social, experiential marketing, multicultural marketing, along with media buying strategy, customer communications, tier two marketing, and marketing financial management."[92] Gilpin is based in Hyundai's Fountain Valley, California headquarters.[93]

112. Gilpin succeeded Angela Zepeda, who was Hyundai Motor America, Inc.'s Chief Marketing Officer from approximately October 2019 to September 2024.[94] On information and belief, Zepeda was based in Hyundai's Fountain Valley, California headquarters while in this role.[95]

113. Olabisi Boyle is the Senior Vice President of Product Planning and Mobility for Hyundai Motor America, Inc.[96] She has been in this role from August 2020 to present.[97] "Boyle leads the strategic direction of Hyundai's U.S. vehicle lineup, leading long-range planning, and overseeing market research, business analytics, and advanced pricing."[98] Since January 2024, she has also led "Hyundai's

---

[92] *Sean Gilpin*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/sean-gilpin (last visited Nov. 17, 2026).

[93] *Sean Gilpin*, LINKEDIN, https://www.linkedin.com/in/gilpinsean/ (last visited Nov. 17, 2026).

[94] *Angela Zepeda*, LINKEDIN, https://www.linkedin.com/in/angela-zepeda/ (last visited Nov. 17, 2026).

[95] *Id.*

[96] *Olabisi Boyle*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/olabisi-boyle (last visited Nov. 17, 2026).

[97] *Olabisi Boyle*, LINKEDIN, https://www.linkedin.com/in/olabisiboyle/ (last visited Nov. 17, 2026).

[98] *Olabisi Boyle*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/olabisi-boyle (last visited Nov. 17, 2026).

U.S. mobility strategy, connected car technology, and future innovations."[99] Boyle is based in Hyundai's Fountain Valley, California headquarters.[100]

114. Michel Poirier is Vice President of Aftersales and Customer Experience for Hyundai Motor America, Inc.[101] He has been in this role from December 2023 to present.[102] "Poirier oversees both the retail and aftersales functions to streamline customer experience (CX) efforts and increase efficiencies."[103] Poirier is based in Hyundai's Fountain Valley, California headquarters.[104]

115. Steven Yandura is Vice President of U.S. National Sales for Hyundai Motor America, Inc.[105] He has been in this role from June 2026 to present.[106] Yandura is "responsible for all aspects of sales and distribution in the United States, including national sales strategy, dealer relations, market representation, and related activities to drive sales growth and market share. He also oversees Hyundai's seven

---

[99] *Id.*

[100] *Olabisi Boyle*, LINKEDIN, https://www.linkedin.com/in/olabisiboyle/ (last visited Nov. 17, 2026).

[101] *Michel Poirier*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/michel-poirier (last visited Nov. 17, 2026).

[102] *Michel Poirier*, LINKEDIN, https://www.linkedin.com/in/michel-poirier-6a1b6a54/ (last visited Nov. 17, 2026).

[103] *Michel Poirier*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/michel-poirier (last visited Nov. 17, 2026).

[104] *Michel Poirier*, LINKEDIN, https://www.linkedin.com/in/michel-poirier-6a1b6a54/ (last visited Nov. 17, 2026).

[105] *Steven Yandura*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/steven-yandura (last visited Nov. 17, 2026).

[106] *Steven Yandura*, LINKEDIN, https://www.linkedin.com/in/steveyandura/ (last visited Nov. 17, 2026).

sales regions."[107] Yandura is based in Hyundai's Fountain Valley, California headquarters.[108]

116. Andrew Franceschini is the Vice President of Product Line Management for Hyundai Motor America, Inc.[109] He has served in this role from approximately September 2025 to present.[110] Franceschini "oversees the optimization of Hyundai's entire product lineup, including product portfolio management and new product readiness. Franceschini leads a team of subject matter experts focused on enhancing Hyundai's go-to-market strategies, product positioning, pricing, incentives, inventory management, and competitive analysis."[111] Previously, he served as Hyundai Motor America, Inc.'s Director and then Executive Director for Product Line Management.[112] Franceschini is based in Hyundai's Fountain Valley, California headquarters.[113]

---

[107] *Steven Yandura*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/steven-yandura (last visited Nov. 17, 2026).

[108] *Steven Yandura*, LINKEDIN, https://www.linkedin.com/in/steveyandura/ (last visited Nov. 17, 2026).

[109] *Andrew Franceschini*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/andrew-franceschini (last visited Nov. 17, 2026).

[110] *Andrew Franceschini*, LINKEDIN, https://www.linkedin.com/in/andrewfranceschini/ (last visited Nov. 17, 2026).

[111] *Andrew Franceschini*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/andrew-franceschini (last visited Nov. 17, 2026).

[112] *Andrew Franceschini*, LINKEDIN, https://www.linkedin.com/in/andrewfranceschini/ (last visited Nov. 17, 2026).

[113] *Id.*

117. Robert Grafton is a Senior Vice President and Head of Global Dealer Network Development for Hyundai Motor Company.[114] He has been in this role from approximately January 2025 to present.[115] Before that, between approximately October 2019 and December 2024, he served as Executive Director, Vice President, and Global Vice President for Dealer Network and Strategy for Hyundai Motor America, Inc.[116] Grafton was based in Hyundai's Fountain Valley, California headquarters for these prior roles, and on information and belief, is based there at least in part in his current role.[117]

118. John Angevine is the Director of Sales Operations for Hyundai Motor America, Inc.[118] He has been in this role from approximately May 2024 to present.[119] Angevine "oversees and manages sales and retail operations including retail process performance, incentive programing, and dealer operations to achieve Hyundai's operational success in the United States."[120] Angevine is based in Hyundai's Fountain Valley, California headquarters.[121]

---

[114] *Robert Grafton*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/robert-grafton (last visited Nov. 17, 2026).

[115] *Robert Grafton*, LINKEDIN, https://www.linkedin.com/in/robertgrafton/ (last visited Nov. 17, 2026).

[116] *Id.*

[117] *Id.*

[118] *John Angevine*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/john-angevine (last visited Nov. 17, 2026).

[119] *John Angevine*, LINKEDIN, https://www.linkedin.com/in/john-angevine-610b555/ (last visited Nov. 17, 2026).

[120] *John Angevine*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/john-angevine (last visited Nov. 17, 2026).

[121] *John Angevine*, LINKEDIN, https://www.linkedin.com/in/john-angevine-610b555/ (last visited Nov. 17, 2026).

119. Ricky Lao is Director of Product Planning for Hyundai Motor America, Inc.[122] He has been in this role from approximately January 2021 to present.[123] "Under Ricky's leadership, the product team focuses on delivering the most competitive vehicles in the automotive industry. The team is responsible for leading the product planning process from concept phase through product launch, and subsequent lifecycle management, for all current and future Hyundai cars and SUVs."[124] Lao is based in Hyundai's Fountain Valley, California headquarters.[125]

120. Nathan Edmonds is Director of Quality and Service Engineering for Hyundai Motor America, Inc.[126] He has been in this role from approximately February 2026 to present.[127] Edmonds "leads enterprise-wide efforts to accelerate improvements in vehicle quality, reliability, and Fix Right First Time performance. In this role, Edmonds oversees the development and execution of quality-driven strategies and service engineering initiatives that enhance the ownership experience and strengthen Hyundai's commitment to delivering exceptional product dependability."[128] Before that, from approximately February 2022 to February 2026, he served as Director for Warranty and Dealer Tech Support for Hyundai

---

[122] *Ricky Lao*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/ricky-lao (last visited Nov. 17, 2026).

[123] *Ricky Lao*, LINKEDIN, https://www.linkedin.com/in/ricky-lao-189303/ (last visited Nov. 17, 2026).

[124] *Ricky Lao*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/ricky-lao (last visited Nov. 17, 2026).

[125] *Ricky Lao*, LINKEDIN, https://www.linkedin.com/in/ricky-lao-189303/ (last visited Nov. 17, 2026).

[126] *Nathan Edmonds*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/nathan-edmonds- (last visited Nov. 17, 2026).

[127] *Nathan Edmonds*, LINKEDIN, https://www.linkedin.com/in/nathan-edmonds-6aa7ba7a/ (last visited Nov. 17, 2026).

[128] *Nathan Edmonds*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/nathan-edmonds- (last visited Nov. 17, 2026).

Motor America, Inc.[129] In that role, he "drove the implementation of warranty operations best practices and guided technical support efforts for Hyundai and Genesis retailers across the United States. His leadership helped advance dealer service capabilities, streamline diagnostic and repair processes, and improve overall customer satisfaction."[130] Since January 2022, Edmonds has also been "responsible for driving business objectives for repair accuracy and efficiency and supporting effective coordination of recall and campaign completion."[131] Edmonds is and was based in Hyundai's Fountain Valley, California headquarters while serving in these roles.[132]

121. In addition to Hyundai Motor America, Inc.'s engineering and safety investigation teams responsible for post-sale investigations located at its Fountain Valley headquarters, Hyundai Motor America, Inc. conducts pre-sale durability testing in California, including at its "California Proving Grounds" located in California City and the "California Design and Research Center" located in Irvine.[133]

122. The California Design and Research Center is Hyundai's "$30 million design facility" that is "fitted with the world's most advanced visualization, graphics, and clay-modeling technologies, keeping Hyundai at the forefront of car

---

[129] *Nathan Edmonds*, LINKEDIN, https://www.linkedin.com/in/nathan-edmonds-6aa7ba7a/ (last visited Nov. 17, 2026).

[130] *Nathan Edmonds*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/bios/nathan-edmonds- (last visited Nov. 17, 2026).

[131] *Id.*

[132] *Nathan Edmonds*, LINKEDIN, https://www.linkedin.com/in/nathan-edmonds-6aa7ba7a/ (last visited Nov. 17, 2026).

[133] *Our Company*, HYUNDAI, https://www.hyundaiusa.com/us/en/our-company (last visited Nov. 17, 2026).

technology and design."[134] The design and engineering work conducted at this facility also extends to Kia vehicles.[135]

123. The California Proving Grounds is Hyundai Motor America, Inc.'s "California testing facility cover[ing] 4,300 acres with eight different driving courses, including a 2.75-mile winding track, a 3.3-mile hill road, and a durability loop that includes a range of special surfaces, from cobblestones to potholes."[136]

124. Defendant Kia America, Inc. is headquartered in Irvine, California and is the entity in the United States responsible for distributing, selling, leasing, and warranting the Kia Class Vehicles.

125. SeungKyu (Sean) Yoon is the President and Chief Executive Officer of Kia America, Inc.[137] He was appointed to this position in March 2018.[138] Yoon "leads the company's strategic vision and operations across North America, encompassing sales in the U.S., Canada, and Mexico, as well as manufacturing in the U.S. and Mexico."[139] Yoon is based in Kia's Irvine, California headquarters.[140]

---

[134] *Id.*

[135] About Us, Hyundai Motor Group, https://www.hatci.com/about (last visited Nov. 17, 2026); *Backgrounder—Hyundai Kia Design and Technical Center*, HYUNDAI MEDIA CENTER, https://www.hyundainews.com/releases/1270 (last visited Nov. 17, 2026).

[136] *Our Company*, HYUNDAI, https://www.hyundaiusa.com/us/en/our-company (last visited Nov. 17, 2026).

[137] *Seungkyu (Sean) Yoon*, KIA MEDIA (Apr. 23, 2012), https://www.kiamedia.com/us/en/media/pressreleases/13858/seungkyu-sean-yoon-1 (last visited Nov. 17, 2026).

[138] *SeungKyu (Sean) Yoon*, LINKEDIN, https://www.linkedin.com/in/seungkyu-sean-yoon-3251b1a9/ (last visited Nov. 17, 2026).

[139] *Id.*

[140] *Id.*

126. Greg Silvestri is the Vice President of Service and Aftersale Operations for Kia America, Inc.[141] He has served in this role from approximately June 2018 to present.[142] He is responsible for "the areas of customer experience, service & parts marketing, parts operations, warranty, consumer affairs and training."[143] Silvestri is based in Kia's Irvine, California headquarters.[144]

127. Eric Watson is the Vice President of Sales Operations for Kia America, Inc.[145] He has served in this role from approximately March 2021 to present.[146] Watson "oversees the company's national and regional and sales operations in the United States."[147] Watson is based in Kia's Irvine, California headquarters.[148]

---

141 *Greg Silvestri*, KIA MEDIA (Mar. 18, 2018), https://www.kiamedia.com/us/en/media/pressreleases/17960/greg-silvestri-1 (last visited Nov. 17, 2026).

142 *Greg Silvestri*, LINKEDIN, https://www.linkedin.com/in/greg-silvestri-133a9a1/ (last visited Nov. 17, 2026).

143 *Greg Silvestri*, KIA MEDIA (Mar. 18, 2018), https://www.kiamedia.com/us/en/media/pressreleases/17960/greg-silvestri-1 (last visited Nov. 17, 2026).

144 *Greg Silvestri*, LINKEDIN, https://www.linkedin.com/in/greg-silvestri-133a9a1/ (last visited Nov. 17, 2026).

145 *Eric Watson*, KIA MEDIA (Mar. 18, 2018), https://www.kiamedia.com/us/en/media/pressreleases/17892/eric-watson (last visited Nov. 17, 2026).

146 *Eric Watson*, LINKEDIN, https://www.linkedin.com/in/eric-watson-5422147/ (last visited Nov. 17, 2026).

147 *Eric Watson*, KIA MEDIA (Mar. 18, 2018), https://www.kiamedia.com/us/en/media/pressreleases/17892/eric-watson (last visited Nov. 17, 2026).

148 *Eric Watson*, LINKEDIN, https://www.linkedin.com/in/eric-watson-5422147/ (last visited Nov. 17, 2026).

128. Brad Mays is the Director of Brand Experience for Kia America, Inc.[149] He has served in this role from approximately February 2023 to present.[150] Mays "oversees media relations, events and partnerships."[151] Mays is based in Kia's Irvine, California headquarters.[152]

129. Steven Center served as the Chief Operating Officer of Kia America, Inc. from January 2022 to September 2025.[153] Center was responsible for "strategy and execution for Kia's sales, service and marketing operations in the United States."[154] Center was based in Kia's Irvine, California headquarters.[155]

130. Russell Wager served as the Director of Marketing for Kia America, Inc. from July 2019 to October 2026.[156] Wager oversaw "all advertising, media,

---

[149] *Brad Mays*, KIA MEDIA (Feb. 2, 2018), https://www.kiamedia.com/us/en/media/pressreleases/19905/brad-mays-19905 (last visited Nov. 17, 2026).

[150] *Brad Mays*, LINKEDIN, https://www.linkedin.com/in/bradmays/ (last visited Nov. 17, 2026).

[151] *Brad Mays*, KIA MEDIA (Feb. 2, 2018), https://www.kiamedia.com/us/en/media/pressreleases/19905/brad-mays-19905 (last visited Nov. 17, 2026).

[152] *Brad Mays*, LINKEDIN, https://www.linkedin.com/in/bradmays/ (last visited Nov. 17, 2026).

[153] *Kia America Appoints Steven Center to Executive Management Team*, PR NEWSWIRE (Jan. 7, 2022), https://www.prnewswire.com/news-releases/kia-america-appoints-steven-center-to-executive-management-team-301456064.html (last visited Nov. 17, 2026); *Steven Center*, LINKEDIN, https://www.linkedin.com/in/steven-center-599a4691/ (last visited Nov. 17, 2026).

[154] *Kia America Appoints Steven Center to Executive Management Team*, PR NEWSWIRE (Jan. 7, 2022), https://www.prnewswire.com/news-releases/kia-america-appoints-steven-center-to-executive-management-team-301456064.html (last visited Nov. 17, 2026).

[155] *Id.*

[156] *Kia Motors America Appoints Russell Wager to Newly Created Position*, KIA MEDIA (July 18, 2019), https://www.kiamedia.com/us/en/media/pressreleases/15193/kia-motors-america-

partnerships and experiential marketing activities."[157] Wager was based in Kia's Irvine, California headquarters.[158]

131. J.S. (Jurassic) Park is the Vice President and Chief Safety Officer for Kia America, Inc.[159] Based in Kia's Irvine, California headquarters, Park participates in all safety-recall decision-making for the U.S. market and acts as the company's liaison with NHTSA regarding Kia recalls, among other things.[160]

132. Kia America, Inc. also maintains the Kia Design Center in Irvine, California next to its headquarters, which is "the center of design-focused efforts responsible for Kia's growing popularity across the North American market."[161]

133. Like Hyundai, Kia America, Inc. conducts pre-sale durability testing of its vehicles at the California Proving Grounds.[162]

134. The ultimate decisions concerning whether to recall the Class Vehicles were made by Defendants Hyundai and Kia and their executives at their respective California headquarters.

---

appoints-russell-wager-to-newly-created-position (last visited Nov. 17, 2026); *Russell Wager Retires As Kia's Top U.S. Marketer*, MEDIAPOST (Nov. 3, 2026), https://www.mediapost.com/publications/article/418726/russell-wager-retires-as-kias-top-us-marketer.html?edition=144371 (last visited Nov. 17, 2026).

[157] *Kia Motors America Appoints Russell Wager to Newly Created Position*, KIA MEDIA (July 18, 2019), https://www.kiamedia.com/us/en/media/pressreleases/15193/kia-motors-america-appoints-russell-wager-to-newly-created-position (last visited Nov. 17, 2026).

[158] *Russell Wager*, LINKEDIN, https://www.linkedin.com/in/russell-wager/ (last visited Nov. 17, 2026).

[159] *See* https://static.nhtsa.gov/odi/rcl/2024/RCAK-24V867-2367.pdf (last visited Nov. 17, 2026).

[160] *Id.*

[161] *About Us*, HYUNDAI MOTOR GROUP, https://www.hatci.com/about (last visited Nov. 17, 2026).

[162] *Id.*

## VII. CLASS ACTION ALLEGATIONS

135. Plaintiffs repeat, re-allege, and incorporate the allegations contained in the paragraphs above.

136. Plaintiffs bring this action on behalf of themselves and all other similarly situated and as a class action under Rule 23 of the Federal Rules of Civil Procedure.

137. Plaintiffs seek to represent a class ("Nationwide Class") under the laws of the state of California defined as:

> All persons who bought or leased a Class Vehicle in the United States.

138. In addition, and in the alternative to the Nationwide Class, Plaintiffs seek to represent the following State Classes:

> **California Class:** All persons who bought or leased a Class Vehicle in the state of California.
>
> **Florida Class:** All persons who bought or leased a Class Vehicle in the state of Florida.
>
> **Illinois Class:** All persons who bought or leased a Class Vehicle in the state of Illinois.
>
> **Minnesota Class:** All persons who bought or leased a Class Vehicle in the state of Minnesota.
>
> **Ohio Class:** All persons who bought or leased a Class Vehicle in the state of Ohio.

139. The Nationwide Class and the State Classes are collectively referred to herein as the Classes.

140. Excluded from the Classes are individuals who have personal injury claims resulting from the Defect in the Class Vehicles. Also excluded from the Classes are Defendants and their subsidiaries and affiliates; all persons who make

a timely election to be excluded from the Classes; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definitions based on information learned through discovery.

141. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

142. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

143. **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Classes or identity of the Class Members, since such information is in the exclusive control of Defendants. Nevertheless, the Classes encompass at least tens of thousands of individuals dispersed throughout the United States. There could be several hundred thousand Class Members and based upon Defendants' own public sales figures of vehicles sold with defective ICCUs. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendants.

144. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

i. whether the Class Vehicles are defective;

ii. whether Defendants misrepresented or failed to disclose the ICCU features, risks, capabilities, and limitations;

iii. the extent to which the ICCUs fail to operate as Defendants represented;

iv. whether the defective ICCUs are defectively designed and/or manufactured;

v. whether Defendants had knowledge of the ICCU Defect in the Class Vehicles when they placed the Class Vehicles into the stream of commerce in the United States;

vi. whether Defendants, in their marketing and sale of the Class Vehicles, violated applicable consumer protection and/or warranty laws;

vii. when Defendants became aware of the existence of the ICCU Defect in the Class Vehicles;

viii. whether Defendants knowingly failed to disclose the existence and cause of the ICCU Defect in the Class Vehicles;

ix. whether Defendants knowingly concealed the ICCU Defect in the Class Vehicles;

x. whether Defendants' conduct as alleged herein violates consumer protection laws;

xi. whether Defendants breached express and/or implied warranties in connection with the sale or lease of the Class Vehicles;

xii. whether Defendants' conduct as alleged herein violates warranty laws;

xiii. whether the Class Vehicles are unmerchantable;

xiv. whether Defendants' conduct as alleged herein violates other laws asserted herein;

xv. whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

xvi. whether Defendants were unjustly enriched by selling or leasing the Class Vehicles equipped with defective ICCUs without disclosing the Defect, thereby increasing their profits at the expense of Class Members;

xvii. the extent of damages, overpayments, repair or replacement costs, and other costs resulting from the defective ICCUs;

xviii. whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of the Defect; and

xix. whether Plaintiffs and Class Members are entitled to damages and equitable relief.

145. **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendants' substantially uniform misconduct as described above. Specifically, Defendants

violated applicable consumer protection laws and breached applicable warranties with respect to Plaintiffs and members of the Classes. Plaintiffs and Class Members seek similar remedies under similar legal theories. There is no antagonism or material factual variation between Plaintiffs' claims and those of the Classes. The Plaintiffs representing the Classes are advancing the same claims and legal theories on behalf of themselves and all other members of the Classes that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

146. **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in automobile class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

147. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by this Court.

148. Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making the relief sought appropriate with respect to the Classes as a whole.

149. The prosecution of separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to the individual Class Members, which could establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of the interests of the other members of the Classes not parties to such adjudications or could substantially impede or impair their ability to protect their interests.

150. The members of the Classes are readily identifiable through Defendants' records.

## VIII. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A. Discovery Rule

151. Plaintiffs and Class Members did not discover and could not have discovered, through the exercise of reasonable diligence, that the Class Vehicles were equipped with defective ICCUs that could fail to properly charge the vehicles' 12-volt batteries, resulting in battery depletion and/or premature battery replacement.

152. Plaintiffs and Class Members had no realistic ability to discover the extent of the ICCU Defect until their Class Vehicles' 12-volt batteries suddenly died, potentially leaving them stranded, and requiring jump-starting, towing, and/or battery replacement. Plaintiffs and Class Members would have had no reason to individually believe that the problems with their Class Vehicles were the result of a widespread ICCU Defect. Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

**B. Equitable Estoppel**

153. Defendants are equitably estopped from asserting the statutes of limitations. Defendants had actual knowledge for several years that the ICCUs installed in the Class Vehicles were defective and prone to fail. Beginning in or around 2021, Defendants continuously manufactured, marketed, distributed, warranted, and sold Class Vehicles equipped with defective ICCUs to consumers throughout the United States.

154. At all relevant times, Defendants knew that they were concealing and misrepresenting material facts concerning the defective ICCUs and continued to omit, misrepresent, and conceal information regarding the ICCU Defect in connection with the marketing, sale, and warranty of the Class Vehicles. Thus, Plaintiffs' and Class Members' claims are not time-barred.

155. State consumer protection laws, together with the doctrines of equitable tolling, fraudulent concealment, and/or the discovery rule, toll the applicable statutes of limitations for Plaintiffs and Class Members because of Defendants' conduct, including, but not limited to, their concealment and omission of material facts concerning the defective ICCUs installed in the Class Vehicles.

156. Defendants' duty to disclose arose, among other things, from their exclusive and/or superior knowledge concerning the design, manufacture, testing, performance, safety, reliability, and warranty history of the Class Vehicles and their ICCUs, as well as Defendants' control over the manufacture, marketing, sale, distribution, and warranty of the Class Vehicles.

157. Defendants knew that the ICCUs installed in the Class Vehicles were defective and prone to failure.

158. Despite their knowledge, Defendants actively concealed and failed to disclose this material information to Plaintiffs and Class Members.

159. Defendants concealed and failed to disclose the ICCU Defect so that they could continue to market and sell the Class Vehicles without disclosing the

true nature and extent of the Defect and prevent or delay Plaintiffs and Class Members from discovering their claims and seeking redress.

160. Plaintiffs and Class Members justifiably relied on Defendants to disclose material facts concerning the Class Vehicles because information concerning the nature, extent, and cause of the ICCU Defect was within Defendants' exclusive and/or superior knowledge and was not reasonably discoverable by Plaintiffs and Class Members before purchase or lease. Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, concealment, omissions, and denial of the facts alleged herein, which conduct is ongoing.

161. Defendants are estopped from asserting that any statutes of limitations ran during the period in which Plaintiffs and Class Members were unaware, and could not reasonably have discovered, the ICCU Defect in their Class Vehicles.

162. Defendants are further equitably estopped from asserting the statutes of limitations as a defense to the claims of Plaintiffs and Class Members based on Defendants' concealment and failure to disclose the ICCU Defect.

163. Additional information supporting Plaintiffs' allegations concerning Defendants' omissions, misrepresentations, knowledge, and concealment is within Defendants' possession, custody, and control.

164. Defendants had and have a duty to disclose to Plaintiffs and Class Members the ICCU Defect and the associated risks of ICCU failure in the Class Vehicles.

165. Defendants breached express and implied warranties and actively and affirmatively concealed and suppressed, both pre-sale and post-sale, the existence and nature of the ICCU Defect, including the risk that the defective ICCUs could fail and impair the operation, reliability, and safety of the Class Vehicles.

# IX. CAUSES OF ACTION

## A. Claims Brought on Behalf of the Nationwide Class (or in the alternative, the State or California Classes)

### COUNT I:

### VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) (Individually and on Behalf of the Nationwide Class, or in the Alternative, the State Classes)

166. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

167. This Court has jurisdiction to decide claims brought under 15 U.S.C.§ 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

168. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Class Members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

169. Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

170. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty. Defendants provided Plaintiffs and Class Members with an implied warranty of merchantability in connection with the purchase or lease of their Class Vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled. Defendants breached their implied warranties, as described herein, and are therefore liable to Plaintiffs and Class Members under 15 U.S.C. § 2310(d)(1).

171. Without limitation, the Class Vehicles are equipped with defective ICCUs that can become damaged and fail to properly charge the vehicles' 12-volt auxiliary batteries. The ICCU Defect can cause the 12-volt battery to discharge, trigger warning messages and progressive reductions in motive power, result in failures of the associated high-voltage fuse and ultimately cause a loss of motive power. The ICCU Defect renders the Class Vehicles unreliable and unsuitable for their ordinary purpose of providing safe and reliable transportation.

172. As alleged above, Defendants knew or should have known of the ICCU Defect through, among other things, pre-production testing, internal testing and investigation, warranty and repair data, consumer complaints, dealer reports, returned-part analyses, service campaigns, communications with regulators, and their own investigation of ICCU failures. Nevertheless, Defendants manufactured, marketed, distributed, sold, and leased the Class Vehicles without adequately disclosing the ICCU Defect to Plaintiffs and Class Members or providing an effective and lasting remedy for the Defect.

173. Any effort by Defendants to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void. Any limitations Defendants might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiffs and Class Members because at the time of purchase and lease, Plaintiffs or Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

174. Any limitations Defendants might seek to impose on their implied warranties are also substantively unconscionable. Defendants knew or should have known of the ICCU Defect before Plaintiffs and Class Members reasonably could have discovered it. Defendants failed to adequately disclose the Defect to Plaintiffs and Class Members, and the latent nature of the ICCU Defect meant that it could

manifest after the expiration of an otherwise applicable durational limitation. Accordingly, enforcement of any limitation that would preclude coverage for the ICCU Defect would be unconscionable.

175. Plaintiffs have had sufficient direct dealings with Defendants, including through Defendants' authorized dealerships, warranty programs, marketing materials, representations, and repair procedures, to establish privity to the extent required by applicable law. In addition, Plaintiffs and Class Members were the intended third-party beneficiaries of contracts between Defendants and their authorized dealers concerning the sale, lease, distribution, and warranty coverage of the Class Vehicles. The authorized dealers were not the intended ultimate consumers of the Class Vehicles; rather, the warranties accompanying the Class Vehicles were intended for and provided for the benefit of purchasers and lessees such as Plaintiffs and Class Members. To the extent applicable state law recognizes additional exceptions to any privity requirement, those exceptions likewise apply.

176. Under 15 U.S.C. § 2310(e), Plaintiffs and Class Members are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs and Class Members under Rule 23 of the Federal Rules of Civil Procedure. Moreover, Defendants have had ample notice of the ICCU Defect and opportunities to cure it through, among other things, warranty claims, consumer complaints, service campaigns, recall campaigns, dealer repairs, and communications with federal regulators, yet have failed to provide Plaintiffs and Class Members with an effective and lasting remedy for the Defect.

177. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendants' breach of implied warranty. Had Plaintiffs and Class Members known of the ICCU Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them. Plaintiffs and Class Members have also incurred, or may

incur, out-of-pocket expenses and other losses associated with diagnosing, repairing, replacing, or otherwise attempting to address the ICCU Defect and its consequences. Because Defendants will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs and Class Members have not re-accepted their Class Vehicles by retaining them.

178. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs individually and on behalf of all other Class Members seek all damages permitted by law, including overpayment and other economic damages related to their Class Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs and Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Class Members in connection with the commencement and prosecution of this action.

179. Plaintiffs and Class Members also seek the establishment of a Defendants-funded program for Plaintiffs and Class Members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the ICCU Defect in their Class Vehicles.

**COUNT II:**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) (Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class)**

180. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

181. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, and Plaintiff Hunter-Brock brings this claim on behalf of herself and the California Class, against Defendants.

182. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

183. Defendants engaged in unfair competition and unfair, unlawful or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the ICCU Defect in the Class Vehicles from Plaintiffs and Class Members, along with concealing the risks, costs, and monetary damage resulting from the ICCU Defect. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the ICCU Defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the Defect.

184. The ICCU Defect in the Class Vehicles constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

185. These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Defect and suppressing other material facts from Plaintiffs and Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class Members. Defendants' omissions and concealment pertained to information that was material to Plaintiffs and Class Members, as it would have been to all reasonable consumers.

186. The injuries suffered by Plaintiffs and Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition,

nor are they injuries that Plaintiffs and Class Members should have reasonably avoided.

187. Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*

188. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT III:

## FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER CALIFORNIA LAW

**(Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class)**

189. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

190. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, and Plaintiff Hunter-Brock brings this claim on behalf of herself and the California Class, against Defendants.

191. The Class Vehicles that Plaintiffs and Class Members purchased or leased were defective because the defective ICCUs can fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power.

192. Defendants failed to disclose the ICCU Defect and acted with reckless disregard for the truth when they failed to disclose that the ICCU Defect could render the Class Vehicles prone to 12-volt battery depletion, premature battery failure, and/or loss of motive power.

193. Defendants had a duty to disclose this material information to Plaintiffs and Class Members because Defendants were in a superior position to know about the existence, nature, cause, and results of the ICCU Defect; Plaintiffs and Class

Members could not reasonably have been expected to learn or discover the ICCU Defect; and Defendants knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the ICCU Defect.

194. Plaintiffs and Class Members did not know about the ICCU Defect and could not have discovered it through reasonably diligent investigation.

195. But for Defendants' fraudulent omissions of material information, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class Members have sustained damage because they purchased or leased Class Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiffs and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease of the Class Vehicles, loss of use of the Class Vehicles, and any other economic losses attributable to the Defect.

196. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class Members, and with the intent to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, with the amount to be determined according to proof at trial.

## COUNT IV:

## UNJUST ENRICHMENT UNDER CALIFORNIA LAW
**In the Alternative to All Other Claims**
**(Individually and On Behalf of the Nationwide Class, or in the Alternative, the California Class)**

197. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

198. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, and Plaintiff Hunter-Brock brings this claim on behalf of herself and the California Class, against Defendants.

199. This claim is pleaded under California law in the alternative to the other claims set forth herein.

200. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of the Class Vehicles that contain the ICCU Defect.

201. In particular, Defendants' concealment of the ICCU Defect meant Plaintiffs and Class Members did not receive the benefit of their bargain in buying or leasing these Class Vehicles, and accordingly, they overpaid for the cars and have incurred other economic losses and costs.

202. As a result of their wrongful acts, concealments, and omissions of the ICCU Defect in the Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

203. Moreover, Defendants continue to profit from their ongoing wrongful behavior by denying the nature and existence of the ICCU Defect to Plaintiffs and Class Members during the duration of Defendants' warranties and refusing to honor the warranties.

204. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of their misconduct alleged herein, Plaintiffs and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

205. Plaintiffs and Class Members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

206. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by their withholding of benefits and monies from Plaintiffs and Class Members rightfully belonging to them.

207. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from their wrongful conduct.

208. As a result of Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

209. Plaintiffs and Class Members have no adequate remedy at law for this claim. Plaintiffs plead this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

210. Plaintiffs and Class Members do not have an adequate remedy at law because damages alone will not remedy the ICCU Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to the Class Vehicles. Damages will only address past injuries visited on Plaintiffs and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiffs and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiffs and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

211. Plaintiffs and Class Members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below—namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered

by Plaintiffs and Class Members, equitable restitution is appropriate and Plaintiffs plead it in the alternative to any available legal remedies.

212. Alternatively, legal remedies available to Plaintiffs and Class Members are "inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief due to significant differences in proof." *See Ramirez v. S. Martinelli & Co*., 2026 WL 272621, at *4-5 (N.D. Cal. Feb. 2, 2026) (quotations omitted).

213. Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading representations or omissions; compelling Defendants to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT V:

## VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*) (Brought by Plaintiff Hunter-Brock Individually and On Behalf of the California Class)

214. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

215. Plaintiff Hunter-Brock brings this claim on behalf of herself and the California Class against Defendants.

216. At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known the specific use for which the Class Vehicles were purchased.

217. Defendants provided Plaintiff and Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles are equipped with defective ICCUs that can become damaged and fail to properly charge the vehicles' 12-volt auxiliary batteries. The ICCU Defect can cause the 12-volt battery to discharge, trigger warning messages and progressive reductions in motive power, result in failures of the associated high-voltage fuse and ultimately cause a loss of motive power.

218. The ICCU Defect renders the Class Vehicles unreliable and unsuitable for their ordinary purpose of providing safe and reliable transportation.

219. As alleged above, Defendants knew or should have known of the ICCU Defect through, among other things, pre-production testing, internal testing and investigation, warranty and repair data, consumer complaints, dealer reports, returned-part analyses, service campaigns, communications with regulators, and their own investigation of ICCU failures. Nevertheless, Defendants manufactured, marketed, distributed, sold, and leased the Class Vehicles without adequately disclosing the ICCU Defect to Plaintiff and Class Members or providing an effective and lasting remedy for the Defect.

220. Any effort by Defendants to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void. Any limitations Defendants might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiff and Class Members, because, at the time of purchase and lease, Plaintiff

and Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

221. Any limitations Defendants might seek to impose on their implied warranties are also substantively unconscionable. Defendants knew or should have known of the ICCU Defect before Plaintiff and Class Members reasonably could have discovered it. Defendants failed to adequately disclose the Defect to Plaintiff and Class Members, and the latent nature of the ICCU Defect meant that it could manifest after the expiration of an otherwise applicable durational limitation. Accordingly, enforcement of any limitation that would preclude coverage for the ICCU Defect would be unconscionable.

222. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose.

223. Defendants' actions, as described herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## B. Claims Brought on Behalf of the Illinois Class

### COUNT VI:

### FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER ILLINOIS LAW

**(Brought By Plaintiff Marina Guseva Individually and on behalf of the Illinois Class)**

224. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

225. Plaintiff Guseva asserts this claim on behalf of herself and the Illinois Class against Defendants under Illinois Law.

226. The Class Vehicles that Plaintiff and Class Members purchased or leased were defective because the defective ICCUs can fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power.

227. Defendants failed to disclose the ICCU Defect and acted with reckless disregard for the truth when they failed to disclose that the ICCU Defect could render the Class Vehicles prone to 12-volt battery depletion, premature battery failure, and/or loss of motive power.

228. Defendants had a duty to disclose this material information to Plaintiff and Class Members because Defendants were in a superior position to know about the existence, nature, cause, and results of the ICCU Defect; Plaintiff and Class Members could not reasonably have been expected to learn or discover the ICCU Defect; and Defendants knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the ICCU Defect.

229. Plaintiff and Class Members did not know about the ICCU Defect and could not have discovered it through reasonably diligent investigation.

230. But for Defendants' fraudulent omissions of material information, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff and Class Members have sustained damage because they purchased or leased Class Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiff and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease of the Class Vehicles, loss of use of the Class Vehicles, and any other economic losses attributable to the Defect.

231. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiff and Class Members, and with the intent to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, with the amount to be determined according to proof at trial.

## COUNT VII:

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW

**(Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class)**

232. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

233. Plaintiff Guseva asserts this claim on behalf of herself and the Illinois Class against Defendants under Illinois Law.

234. Defendants are and were at all relevant times a merchant with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

235. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

236. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law pursuant to 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212 in transactions for the purchase and lease of the Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

237. The Class Vehicles, when sold and leased, and at all times, thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the defective ICCUs fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power. The ICCU Defect renders the Class Vehicles unmerchantable.

238. Defendants were provided notice of the issues complained of herein by numerous complaints they received about them.

239. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents to establish privity of contract between Defendants on one hand, and Plaintiff and each of the Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

240. As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured, and are entitled to damages.

**COUNT VIII:**

**UNJUST ENRICHMENT UNDER ILLINOIS LAW**
**In the Alternative to All Other Claims**
**(Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class)**

241. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

242. Plaintiff Guseva brings this claim individually and on behalf of the Illinois Class.

243. This claim is pleaded under Illinois law in the alternative to the other claims set forth herein.

244. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of the Class Vehicles that contain the ICCU Defect.

245. In particular, Defendants' concealment of the ICCU Defect meant Plaintiff and Class Members did not receive the benefit of their bargain in buying

or leasing these Class Vehicles, and accordingly, they overpaid for the cars and have incurred other economic losses and costs.

246. As a result of their wrongful acts, concealments, and omissions of the ICCU Defect in the Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

247. Moreover, Defendants continue to profit from their ongoing wrongful behavior by denying the nature and existence of the ICCU Defect to Plaintiff and Class Members during the duration of Defendants' warranties and refusing to honor the warranties.

248. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of their misconduct alleged herein, Plaintiff and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

249. Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

250. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by their withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

251. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from their wrongful conduct.

252. As a result of Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

253. Plaintiff and Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

254. Plaintiff and Class Members do not have an adequate remedy at law because damages alone will not remedy the ICCU Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to the Class Vehicles. Damages will only address past injuries visited on Plaintiff and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiff and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiff and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

255. Plaintiff and Class Members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below–namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and Class Members, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

256. Alternatively, legal remedies available to Plaintiff and Class Members are inadequate.

257. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution,

sales, and lease practices with respect to the Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading representations or omissions; compelling Defendants to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**COUNT IX:**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq*. and 720 ILCS 295/1a) (Brought By Plaintiff Marina Guseva Individually and on Behalf of the Illinois Class)**

258. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

259. Plaintiff Guseva brings this claim individually and on behalf of the Illinois Class.

260. Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

261. Plaintiff is a "consumer" as that term is defined in 815 ILCS 505/1(e).

262. Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

263. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

264. Defendants engaged in unfair or deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

265. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed, distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

266. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Illinois Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

267. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Illinois Class Members suffered an injury to their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

268. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff's and the Illinois Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

269. Pursuant to 815 ILCS 505/10a(a), Plaintiff and Class Members seek monetary relief against Defendants in the amount of actual damages, as well as

punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent. Plaintiff and Class Members also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

**C. Claims Brought on Behalf of the Ohio Class**

**COUNT X:**

**FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER OHIO LAW (Brought By Plaintiff Joshua Davis Individually and on behalf of the Ohio Class)**

270. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

271. Plaintiff Davis asserts this claim on behalf of himself and the Ohio Class against Defendants under Ohio Law.

272. The Class Vehicles that Plaintiff and Class Members purchased or leased were defective because the defective ICCUs can fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power.

273. Defendants failed to disclose the ICCU Defect and acted with reckless disregard for the truth when they failed to disclose that the ICCU Defect could render the Class Vehicles prone to 12-volt battery depletion, premature battery failure, and/or loss of motive power.

274. Defendants had a duty to disclose this material information to Plaintiff and Class Members because Defendants were in a superior position to know about the existence, nature, cause, and results of the ICCU Defect; Plaintiff and Class Members could not reasonably have been expected to learn or discover the ICCU Defect; and Defendants knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the ICCU Defect.

275. Plaintiff and Class Members did not know about the ICCU Defect and could not have discovered it through reasonably diligent investigation.

276. But for Defendants' fraudulent omissions of material information, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff and Class Members have sustained damage because they purchased or leased Class Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiff and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease of the Class Vehicles, loss of use of the Class Vehicles, and any other economic losses attributable to the Defect.

277. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiff and Class Members, and with the intent to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, with the amount to be determined according to proof at trial.

## COUNT XI:

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER OHIO LAW (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class)

278. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

279. Plaintiff Davis asserts this claim on behalf of himself and the Ohio Class against Defendants under Ohio Law.

280. Defendants are "merchants" as defined under Ohio Rev. Code § 1302.01 and § 1310.01.

281. The Class Vehicles are "goods" as defined under the UCC.

282. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class

Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

283. The Class Vehicles, when sold and leased, and at all times, thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the defective ICCUs fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power. The ICCU Defect renders the Class Vehicles unmerchantable.

284. Defendants were provided notice of the issues complained of herein by numerous complaints they received about them.

285. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents to establish privity of contract between Defendants on one hand, and Plaintiff and each of the Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

286. As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured, and are entitled to damages.

## COUNT XII:

## UNJUST ENRICHMENT UNDER OHIO LAW
**In the Alternative to All Other Claims**
**(Brought By Plaintiff Joshua Davis**
**Individually and on Behalf of the Ohio Class)**

287. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

288. Plaintiff Davis brings this claim individually and on behalf of the Ohio Class.

289. This claim is pleaded under Ohio law in the alternative to the other claims set forth herein.

290. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of the Class Vehicles that contain the ICCU Defect.

291. In particular, Defendants' concealment of the ICCU Defect meant Plaintiff and Class Members did not receive the benefit of their bargain in buying or leasing these Class Vehicles, and accordingly, they overpaid for the cars and have incurred other economic losses and costs.

292. As a result of their wrongful acts, concealments, and omissions of the ICCU Defect in the Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

293. Moreover, Defendants continue to profit from their ongoing wrongful behavior by denying the nature and existence of the ICCU Defect to Plaintiff and Class Members during the duration of Defendants' warranties and refusing to honor the warranties.

294. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of their misconduct alleged herein, Plaintiff and

the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

295. Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

296. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by their withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

297. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from their wrongful conduct.

298. As a result of Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

299. Plaintiff and Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

300. Plaintiff and Class Members do not have an adequate remedy at law because damages alone will not remedy the ICCU Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to the Class Vehicles. Damages will only address past injuries visited on Plaintiff and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiff and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiff and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

301. Plaintiff and Class Members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below–namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and Class Members, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

302. Alternatively, legal remedies available to Plaintiff and Class Members are inadequate.

303. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading representations or omissions; compelling Defendants to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**COUNT XIII:**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (OHIO REV. CODE §§ 1345.01, *et seq.*) (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class)**

304. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

305. Plaintiff Davis brings this claim individually and on behalf of the Ohio Class.

306. Ohio Rev. Code § 1345.02(A) prohibits unfair or deceptive acts or practices in connection with consumer transactions, including acts occurring before, during, or after the transaction. Sections 1345.02(B)(1) and (2) prohibit misrepresentations concerning performance characteristics, uses, benefits, standard, or quality.

307. Defendants engaged in unfair or deceptive conduct by concealing the known ICCU Defect while marketing and supplying the Class Vehicles as suitable for ordinary transportation. The omission was material because the Defect could prevent charging of the 12-volt battery and cause reduced or complete loss of motive power.

308. A consumer injured by a violation of the Ohio Consumer Sales Practices Act ("OCSPA") may seek actual economic damages and other relief authorized by Ohio Rev. Code § 1345.09, including injunctive relief and reasonable attorneys' fees for knowing violations. Class relief is available subject to the requirements of § 1345.09(B).

309. To recover damages under the OCSPA, Plaintiff must establish that Defendants committed an unfair or deceptive act or practice in connection with a consumer transaction and that their conduct proximately caused Plaintiff's injury.

310. Plaintiff and Ohio Class Members are consumers within the meaning of Ohio Rev. Code § 1345.01(D). Defendants are suppliers within the meaning of

§ 1345.01(C), and the purchase or lease of Class Vehicles primarily for personal, family, or household purposes constitutes a consumer transaction under § 1345.01(A).

311. Ohio law evaluates whether conduct is unfair or deceptive from the perspective of a reasonable consumer. Deception exists where a supplier's conduct would mislead a reasonable consumer. Intent to deceive is not necessary to establish a deceptive act or practice under Ohio Rev. Code § 1345.02. *See Loury v. Westside Auto. Grp.*, 199 N.E.3d 62, 69 (Ohio Ct. App. 2022).

312. Defendants engaged in unfair or deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

313. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed, distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

314. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Ohio Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

315. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Ohio Class suffered an injury to

their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

316. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff's and the Ohio Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

317. For class relief under Ohio Rev. Code § 1345.09(B), "there must be a substantial similarity between a defendant's alleged violation of the Act and an act or practice previously declared deceptive by either a rule promulgated by the Attorney General or a court decision that was publicly available when the alleged violation occurred." *Marrone v. Philip Morris USA, Inc.*, 850 N.E.2d 31, 36 (Ohio 2006).

318. Before Plaintiff's purchase, the Ohio Attorney General had adopted Ohio Admin. Code 109:4-3-16(B)(3), declaring it unfair or deceptive for a manufacturer or dealer to use statements, layouts, or illustrations in advertisements or sales presentations that could create a false impression concerning a material aspect of a vehicle. Defendants' conduct is substantially similar to the conduct prohibited by that rule because Defendants marketed the Class Vehicles as suitable for ordinary transportation while concealing the known ICCU Defect, thereby creating a false impression concerning the vehicles' reliability, safety, and ability to operate as intended. Accordingly, Plaintiff and the Ohio Class seek relief pursuant to Ohio Rev. Code § 1345.09(B).

319. Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and members of the Ohio Class seek actual economic damages, reasonable attorneys' fees for knowing violations, costs, injunctive relief, and such other relief as the Court deems appropriate. Plaintiff seeks class relief subject to § 1345.09(B), and treble damages

only on an individual basis to the extent that provision permits, without duplicative recovery.

**COUNT XIV:**

**VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (OHIO REV. CODE §§ 4165.01, *et seq.*) (Brought By Plaintiff Joshua Davis Individually and on Behalf of the Ohio Class)**

320. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

321. Plaintiff Davis brings this claim individually and on behalf of the Ohio Class.

322. Ohio Rev. Code § 4165.02(A) prohibits deceptive acts or practices in connection with consumer transactions. Sections 4165.02(A)(7) and (9) prohibit misrepresentations concerning performance characteristics, uses, benefits, standard, or quality.

323. Defendants engaged in unfair or deceptive conduct by concealing the known ICCU Defect while marketing and supplying the Class Vehicles as suitable for ordinary transportation. The omission was material because the Defect could prevent charging of the 12-volt battery and cause reduced or complete loss of motive power.

324. A consumer injured by a violation of the Ohio Deceptive Trade Practices Act ("ODTPA") may seek actual economic damages and other relief authorized by Ohio Rev. Code § 4165.03, including injunctive relief and reasonable attorneys' fees for knowing violations.

325. To recover damages under the ODTPA, Plaintiff must establish that Defendants committed an unfair or deceptive act or practice in connection with a consumer transaction and that their conduct proximately caused Plaintiff's injury.

326. Plaintiff, Ohio Class Members, and Defendants are persons within the meaning of Ohio Rev. Code § 4165.01(D).

327. Defendants engaged in deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

328. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed, distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

329. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Ohio Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

330. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Ohio Class suffered an injury to their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

331. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff's and the Ohio Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

332. Pursuant to Ohio Rev. Code § 4165.03, Plaintiff and members of the Ohio Class seek actual economic damages, reasonable attorneys' fees for knowing

violations, costs, injunctive relief, and such other relief as the Court deems appropriate.

### D. Claims Brought on Behalf of the Florida Class

**COUNT XV:**

**VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**
**(Brought By Plaintiff Alan Freidel Individually and on Behalf of the Florida Class)**

333. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

334. Plaintiff Freidel brings this claim individually and on behalf of the Florida Class.

335. In Florida, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

336. Plaintiff Freidel and the members of the putative Florida Class are "consumers" within the meaning of Florida Statute § 501.203(7).

337. Defendants' practice of omitting material information about the Class Vehicles constitutes unfair, deceptive, or unconscionable trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") as provided by §§ 501.201-.213

338. Defendants engaged in unfair or deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

339. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed,

distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

340. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Florida Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

341. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Florida Class suffered an injury to their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

342. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff's and the Florida Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

343. As a result of Defendants' unfair and deceptive trade practices, Plaintiff Freidel and Class Members have suffered actual damages in that they would not have purchased their Class Vehicles or they would have paid less for them if Defendants had disclosed the ICCU Defect.

344. In addition, as a result of these unfair and deceptive trade practices, Plaintiff Freidel and the members of the putative Florida Class have suffered actual damages in that they paid more for their Class Vehicles because Defendants' omissions artificially inflated the purchase price.

345. Plaintiff Freidel and the Florida Class Members are entitled to recover compensatory damages, costs, and reasonable attorneys' fees.

## COUNT XVI:

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW
**Fla. Stat. § 672.103, *et seq.***
**(Brought By Plaintiff Alan Freidel Individually and on Behalf of the Florida Class)**

346. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

347. Plaintiff Freidel asserts this claim on behalf of himself and the Florida Class against Defendants under Florida Law.

348. Defendants are and were at all relevant times a merchant with respect to the Class Vehicles. Defendants directly sold and marketed their Class Vehicles to customers through authorized dealers, for the intended purpose of consumers purchasing the vehicles. The Class Vehicles passed from dealer to the Plaintiffs and the Class Members without modification to the ICCU.

349. Florida has adopted the Uniform Commercial Code ("UCC"). Fla. Stat. § 672.103.

350. Under the UCC, Plaintiffs and Class Members are "buyers", Defendants are a "seller", and the Class Vehicles are "consumer goods."

351. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

352. The Class Vehicles, when sold and leased, and at all times, thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which vehicles are used and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the defective ICCUs fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion,

premature battery failure, and/or loss of motive power. The ICCU Defect renders the Class Vehicles unmerchantable.

353. Defendants were provided notice of the issues complained of herein by numerous complaints they received about them.

354. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents to establish privity of contract between Defendants on one hand, and Plaintiff and each of the Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

355. As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured, and are entitled to damages.

**COUNT XVII:**

**FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER FLORIDA LAW**
**In the Alternative to All Other Claims**
**(Brought by Plaintiff Alan Freidel Individually and on Behalf of the Florida Class)**

356. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

357. Plaintiff Freidel brings this claim individually and on behalf of the Florida Class against Defendants under Florida Law.

358. The Class Vehicles that Plaintiffs and Class Members purchased or leased were defective because the defective ICCUs can fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power.

359. Defendants failed to disclose the ICCU Defect and acted with reckless disregard for the truth when they failed to disclose that the ICCU Defect could render the Class Vehicles prone to 12-volt battery depletion, premature battery failure, and/or loss of motive power.

360. Defendants had a duty to disclose this material information to Plaintiff and Class Members because Defendants were in a superior position to know about the existence, nature, cause, and results of the ICCU Defect; Plaintiff and Class Members could not reasonably have been expected to learn or discover the ICCU Defect; and Defendants knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the ICCU Defect.

361. Plaintiff and Class Members did not know about the ICCU Defect and could not have discovered it through reasonably diligent investigation.

362. But for Defendants' fraudulent omissions of material information, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff and Class Members have sustained damage because they purchased or leased Class Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiff and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease of the Class Vehicles, loss of use of the Class Vehicles, and any other economic losses attributable to the Defect.

363. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiff and Class Members, and with the intent to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, with the amount to be determined according to proof at trial.

## COUNT XVIII:

## UNJUST ENRICHMENT UNDER FLORIDA LAW
**In the Alternative to All Other Claims**
**(Brought By Plaintiff Alan Freidel**
**Individually and on Behalf of the Florida Class)**

364. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

365. Plaintiff Freidel brings this claim individually and on behalf of the Florida Class.

366. This claim is pleaded under Florida law in the alternative to the other claims set forth herein.

367. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of the Class Vehicles that contain the ICCU Defect.

368. In particular, Defendants' concealment of the ICCU Defect meant Plaintiff and Class Members did not receive the benefit of their bargain in buying or leasing these Class Vehicles, and accordingly, they overpaid for the cars and have incurred other economic losses and costs.

369. As a result of their wrongful acts, concealments, and omissions of the ICCU Defect in the Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

370. Moreover, Defendants continue to profit from their ongoing wrongful behavior by denying the nature and existence of the ICCU Defect to Plaintiff and Class Members during the duration of Defendants' warranties and refusing to honor the warranties.

371. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of their misconduct alleged herein, Plaintiff and

the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

372. Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

373. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by their withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

374. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from their wrongful conduct.

375. As a result of Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

376. Plaintiff and Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

377. Plaintiff and Class Members do not have an adequate remedy at law because damages alone will not remedy the ICCU Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to the Class Vehicles. Damages will only address past injuries visited on Plaintiff and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiff and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiff and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

378. Plaintiff and Class Members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below–namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered by Plaintiff and Class Members, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

379. Alternatively, legal remedies available to Plaintiff and Class Members are inadequate.

380. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading representations or omissions; compelling Defendants to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### E. Claims Brought on Behalf of the Minnesota Class

**COUNT XIX:**

**VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**Minn. Stat. § 325F.68, *et seq*.**
**(Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)**

381. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

382. Plaintiff Fishman brings this claim individually and on behalf of the Minnesota Class.

383. Defendants' practices were and are in violation of Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.67, *et seq*.

384. Defendants are considered a "person" as defined in Minn. Stat. § 325F.68, subd. 3.

385. As alleged, Defendants engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in Minnesota. Specifically, Defendants omitted material information regarding the ICCU Defect described herein, which can cause vehicles to fail. These are material facts of which each Class Member should have been informed before purchasing their Class Vehicles.

386. Defendants engaged in unfair or deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

387. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed,

distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

388. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Minnesota Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

389. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Minnesota Class suffered an injury to their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

390. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff's and the Minnesota Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

391. Defendants owed Plaintiff Fishman and those similarly situated a duty to disclose the defective nature of the Class Vehicles because Defendants possessed exclusive and superior information about the manufacture of the products, the complaints received, and the testing of the products. Defendants' failure to inform consumers of the defect was likely to deceive reasonable consumers.

392. Defendants also owed a duty to disclose the defect as it presented a safety hazard to riders.

393. Plaintiff Fishman and the other members of the Minnesota Class purchased their Class Vehicles from Defendants' authorized dealers, but did not obtain the full value of the advertised products. If Plaintiff and other Class Members

had known the true nature of Defendants' product, they would not have purchased the Class Vehicles for the price they paid.

394. In addition, as a result of these unfair and deceptive trade practices, Plaintiff Fishman and the Minnesota Class Members have suffered actual injury in that they paid more for their Class Vehicles because Defendants' omissions artificially inflated the purchase price.

395. As a direct result of Defendants' unlawful deceptive business practices, Plaintiff Fishman and the Minnesota Class suffered injury by lost money or property.

396. Plaintiff Fishman and the Minnesota Class seek an award of damages for violations of Minn. Stat. § 325F.67 pursuant to Minn. Stat. § 8.31, subd. 3a. Plaintiff Fishman and the Minnesota Class also seek an award of attorneys' fees for violations of Minn. Stat. §§ 325F.67-325F.69 pursuant to Minn. Stat. § 8.31, subd. 3a. and all other relief as appropriate.

## COUNT XX:

## VIOLATIONS OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT ("MDTPA") Minn. Stat. § 325D.43, *et seq.* (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)

397. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

398. Plaintiff Fishman brings this claim individually and on behalf of the Minnesota Class.

399. Minnesota affords a cause of action to any person harmed by an entity's use of deceptive trade practices. Minn. Stat. § 325D.45, Subd.3.

400. Under the MDTPA, a "person engages in a deceptive trade practice when, in the course of business, vocation or occupation, the person . . . engaged in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices[.]" Minn. Stat. § 325D.44, subd. 1(13).

401. Defendants engaged in conduct that violated the MDTPA as described herein.

402. Defendants advertised, offered, or sold goods or services in Minnesota and engaged in trade or commerce directly or indirectly affecting the people of Minnesota.

403. Defendants engaged in unfair or deceptive conduct when they did not disclose facts concerning the defective ICCUs installed in the Class Vehicles that were marketed and sold to Plaintiff and Class Members. Among other things, Defendants failed to adequately disclose that the ICCUs were defective and prone to failure and could cause the vehicles' 12-volt batteries to lose their charge, resulting in battery depletion, premature battery failure, reduced or complete loss of motive power, and/or rendering the Class Vehicles inoperable.

404. Defendants' unfair or deceptive acts or practices occurred in trade or commerce and affected the public interest because Defendants marketed, distributed, sold, leased, and warranted the Class Vehicles equipped with defective ICCUs to Plaintiff and Class Members.

405. The facts concealed and omitted by Defendants were material because a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle and how much to pay for such a vehicle. Had Plaintiff and the Minnesota Class Members known of the true facts at the time they purchased or leased their Class Vehicles, they would not have purchased or leased the vehicles or would have paid substantially less for them.

406. The Class Vehicles would not pass without objection in their trade, are not of fair average quality, and are not fit for the ordinary purposes for which it is sold. The Class Vehicles suffer from a defective ICCU which can render the vehicle inoperable.

407. The Class Vehicles were defective at the time they left the possession of Defendants. The ICCU was defectively designed as described herein. Defendants knew of this defect at the time they sold the Class Vehicles.

408. Defendants intentionally and knowingly violated Minnesota law, and recklessly disregarded Plaintiff and Class Members' rights. Defendants were on notice that their Class Vehicles were inadequate because the ICCU could render them inoperable.

409. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the safety of the Class Vehicles.

410. Defendants intended to, and did, mislead Plaintiff and Class Members and induced them to rely on their misrepresentations and omissions.

411. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and members of the Minnesota Class suffered an injury to their business or property, including overpayment for their Class Vehicles, and other economic losses alleged herein.

412. Defendants' unfair and deceptive acts and practices were a proximate cause of Plaintiff and the Minnesota Class Members' injuries because Defendants' concealment and failure to disclose the ICCU Defect caused them to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or to pay more for those vehicles than they otherwise would have paid.

413. In addition, as a result of these unfair and deceptive trade practices, Plaintiff Fishman and the Minnesota Class Members have suffered actual injury in that they paid more for their Class Vehicles because Defendants' omissions artificially inflated the purchase price.

414. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

**COUNT XXI:**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER MINNESOTA LAW Minn. Stat. § 336.2-314 (Brought By Plaintiff Jay Fishman Individually and on Behalf of the Minnesota Class)**

415. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

416. Plaintiff Fishman asserts this claim on behalf of himself and the Minnesota Class against Defendants under Minnesota Law.

417. Defendants are and were at all relevant times a merchant with respect to the Class Vehicles. Defendants directly sold and marketed their Class Vehicles to customers through authorized dealers, for the intended purpose of consumers purchasing the vehicles. The Class Vehicles passed from dealer to the Plaintiffs and the Class Members without modification to the ICCU.

418. Minnesota has adopted the Uniform Commercial Code ("UCC"). Minn. Stat. § 336.2-314.

419. Under the UCC, Plaintiffs and Class Members are "buyers", Defendants are a "seller", and the Class Vehicles are "consumer goods."

420. Defendants impliedly warranted to Plaintiffs and the Class that the Class Vehicles were "merchantable" meaning it would pass without objection in the trade under the contract description, be of fair average quality within the description, and fit for the ordinary purposes for which such goods are used.

421. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of the Class Vehicles. Defendants impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

422. The Class Vehicles, when sold and leased, and at all times, thereafter, were not in merchantable condition, are not fit for the ordinary purpose for which

vehicles are used and fall short of a minimum expectation of quality. Specifically, the Class Vehicles are inherently defective in that the defective ICCUs fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power. The ICCU Defect renders the Class Vehicles unmerchantable.

423. Defendants were provided notice of the issues complained of herein by numerous complaints they received about them.

424. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendants or their agents to establish privity of contract between Defendants on one hand, and Plaintiff and each of the Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the Class Members are the intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

425. As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured, and are entitled to damages.

## COUNT XXII:

## UNJUST ENRICHMENT UNDER MINNESOTA LAW
**In the Alternative to All Other Claims**
**(Brought By Plaintiff Jay Fishman**
**Individually and on Behalf of the Minnesota Class)**

426. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

427. Plaintiff Fishman brings this claim individually and on behalf of the Minnesota Class.

428. This claim is pleaded under Minnesota law in the alternative to the other claims set forth herein.

429. As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and lease of the Class Vehicles that contain the ICCU Defect.

430. In particular, Defendants' concealment of the ICCU Defect meant Plaintiff and Class Members did not receive the benefit of their bargain in buying or leasing these Class Vehicles, and accordingly, they overpaid for the cars and have incurred other economic losses and costs.

431. As a result of their wrongful acts, concealments, and omissions of the ICCU Defect in the Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiff and Class Members paid this higher price for their vehicles to Defendants' authorized distributors and dealers.

432. Moreover, Defendants continue to profit from their ongoing wrongful behavior by denying the nature and existence of the ICCU Defect to Plaintiff and Class Members during the duration of Defendants' warranties and refusing to honor the warranties.

433. Defendants have voluntarily accepted and retained these profits and benefits, knowing that, as a result of their misconduct alleged herein, Plaintiff and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Defendants had represented and that a reasonable consumer would expect. Plaintiff and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a defect that makes the vehicle unreliable and poses a serious safety risk.

434. Plaintiff and Class Members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants' conduct.

435. Defendants have been unjustly enriched by their deceptive, wrongful, and unscrupulous conduct and by their withholding of benefits and monies from Plaintiff and Class Members rightfully belonging to them.

436. Equity and good conscience militate against permitting Defendants to retain these profits and benefits from their wrongful conduct.

437. As a result of Defendants' unjust enrichment, Plaintiff and Class Members have suffered damages.

438. Plaintiff and Class Members have no adequate remedy at law for this claim. Plaintiff pleads this claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

439. Plaintiff and Class Members do not have an adequate remedy at law because damages alone will not remedy the ICCU Defect or stop Defendants' deceptive distribution, sales, and lease practices with respect to the Class Vehicles. Damages will only address past injuries visited on Plaintiff and Class Members. Only injunctive relief can prevent any future harm, as detailed below. Plaintiff and Class Members wish to purchase Defendants' vehicles in the future, but without such remedies Plaintiff and Class Members could not trust that Defendants' distribution, sales, and lease practices were lawful or that vehicles would be free of defects. Without an equitable remedy, it would be difficult to know whether Defendants had ceased their deceptive distribution, sales, and lease practices.

440. Plaintiff and Class Members also seek restitution as an equitable remedy. Even where damages may be technically available, they are inadequate here for the reasons stated above and below–namely, that damages address only past harm and cannot prevent future unlawful conduct, that the Court's discretion in fashioning equitable relief is broader than its discretion in awarding damages, and that restitution is available even in circumstances where damages would not be, including where the value of services received would otherwise offset a damages award. Because legal remedies are inadequate to fully address the injuries suffered

by Plaintiff and Class Members, equitable restitution is appropriate and Plaintiff pleads it in the alternative to any available legal remedies.

441. Alternatively, legal remedies available to Plaintiff and Class Members are inadequate.

442. Additionally, Plaintiff seeks injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiff also seeks injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles; enjoining Defendants from selling the Class Vehicles with the misleading representations or omissions; compelling Defendants to provide Class Members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT XXIII:

## FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT UNDER MINNESOTA LAW (Brought By Plaintiff Jay Fishman Individually and On behalf of the Minnesota Class)

443. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

444. Plaintiff Jay Fishman asserts this claim on behalf of himself and the Minnesota Class against Defendants under Minnesota Law.

445. The Class Vehicles that Plaintiff and Class Members purchased or leased were defective because the defective ICCUs can fail to properly charge the vehicles' 12-volt batteries, leading to battery depletion, premature battery failure, and/or loss of motive power.

446. Defendants failed to disclose the ICCU Defect and acted with reckless disregard for the truth when they failed to disclose that the ICCU Defect could render the Class Vehicles prone to 12-volt battery depletion, premature battery failure, and/or loss of motive power.

447. Defendants had a duty to disclose this material information to Plaintiff and Class Members because Defendants were in a superior position to know about the existence, nature, cause, and results of the ICCU Defect; Plaintiff and Class Members could not reasonably have been expected to learn or discover the ICCU Defect; and Defendants knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the ICCU Defect.

448. Plaintiffs and Class Members did not know about the ICCU Defect and could not have discovered it through reasonably diligent investigation.

449. But for Defendants' fraudulent omissions of material information, Plaintiff and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class Members have sustained damage because they purchased or leased Class Vehicles that were not as represented. Accordingly, Defendants are liable to Plaintiffs and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease of the Class Vehicles, loss of use of the Class Vehicles, and any other economic losses attributable to the Defect.

450. Defendants' acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class Members, and with the intent to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, with the amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes as defined herein;

B. Appoint Plaintiffs as representatives of the Classes and their counsel as Class Counsel;

C. Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class Members are entitled;

D. Award pre- and post-judgment interest on any monetary relief;

E. Grant appropriate injunctive relief against all Defendants, including an order requiring Defendants to permanently and completely repair the Class Vehicles;

F. Determine that Defendants are financially responsible for all Class notice and administration of Class relief;

G. Award reasonable attorneys' fees and costs; and

H. Grant such further relief that this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

DATED: November 18, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: *<u>/s/ Christopher R. Pitoun</u>*
Christopher R. Pitoun (SBN 290235)
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
christopherp@hbsslaw.com

Shelby R. Smith (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
shelby@hbsslaw.com

Rachel E. Fitzpatrick (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 W. Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
rachelf@hbsslaw.com

E. Powell Miller (*pro hac vice forthcoming*)
Dennis A. Lienhardt (*pro hac vice forthcoming*)
Dana E. Fraser (*pro hac vice forthcoming*)
Aya Chouaib (*pro hac vice forthcoming*)
**THE MILLER LAW FIRM P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com
ac@millerlawpc.com

Sam Leonard (*pro hac vice forthcoming*)
**LEONARD LAW, PLLC**
1700 7th Ave, Suite 2100
Seattle, WA 98116
Telephone: (206) 486-1176
sam@seattledebtdefense.com

Stephen R. Basser (SBN 121590)
**BARRACK, RODOS & BACINE**
3580 Carmel Mountain Road, Suite 460
San Diego, California 92130
Telephone: (619) 230-0800
sbasser@barrack.com

Andrew J. Heo (*pro hac vice forthcoming*)
**BARRACK, RODOS & BACINE**
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963-0600
aheo@barrack.com

*Attorneys for Plaintiffs*